*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHIRLEY M., | ) | |
| | ) | Supreme Court No. S-15472 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-00379 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6979 – January 9, 2015 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for Appellant. David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

STOWERS, Justice.

I.     INTRODUCTION

Shirley M. appeals termination of her parental rights to her child, Abigail, on the grounds that the trial court erred in finding that: (1) Shirley failed to remedy the conduct that put Abigail at risk of harm; (2) the Office of Children's Services (OCS)

made reasonable efforts to provide services to reunify the family; (3) termination was in Abigail's best interests; and (4) OCS did not abuse its discretion in placing Abigail with her foster parents and not her great-grandmother, Rae. We affirm the decision of the trial court.

## II.    FACTS AND PROCEEDINGS

### A.    The Family And Its History With OCS

Shirley[1] is the mother of Abigail, born in April 2010. For many years violence, prostitution, reported substance abuse, and other crimes have consumed Shirley's life. Abigail is Shirley's fifth child: Haily was born in 2002, Daisy was born in 2003, Penny was born in 2005, and Andrew was born in 2008. Shirley's involvement with OCS began in April 2003, long before Abigail's birth. In March 2004 OCS received a high priority report that the father of Shirley's older children was abusing Haily. OCS removed the children but later returned them with in-home services and custody supervision. OCS made a referral for in-home services, including parenting training for both parents. Although the family participated in the services, OCS continued to have concerns. In June 2005 OCS considered removing the children from the home again after receiving another report that the father was abusing Haily. Shortly after Penny was born OCS petitioned to place the three children under supervision. Not long after that, Penny died due to asphyxiation. It was suspected that Shirley rolled over onto Penny when the family was sleeping in a tent in the yard at Rae's residence. According to the social worker who saw Haily and Daisy the day they were removed from Shirley's care, the children had low muscle tone and few speech skills. The social worker also reported that the children were generally unruly, screaming and trying to break things, and hitting and pinching each other.

---

[1]    Pseudonyms have been used to protect the privacy of the parties.

OCS arranged for Shirley to complete a psychological assessment, which took place in April 2006 with clinical psychologist Dr. Michael Rose. After conducting multiple screening tests and an interview with Shirley, Dr. Rose concluded that she had a personality disorder and was not competent to parent her children effectively. According to Dr. Rose, Shirley had significant psychological problems, including issues with impulse control, difficulty with anger management, aggression, feelings of insecurity, difficulty with relationships, and mistrust. She blamed others for her problems, exhibiting anti-social, schizoid, or borderline personality features and possibly psychotic thinking processes. In spite of her attempts to present herself favorably during the evaluation, she showed elevated signs of abuse, distress, and rigidity, indicating a high risk of dysfunctional parenting; a second screening test showed a high probability of substance dependence. Dr. Rose diagnosed Shirley with adjustment disorder with mixed disturbance of emotions, and borderline personality disorder as well as severe psychosocial stressors. Dr. Rose recommended long-term individual psychotherapy, such as dialectical behavior therapy, which is a form of cognitive behavior therapy designed for individuals with borderline personality disorder or mood disorders. According to Dr. Rose, this therapy usually takes at least one year for changes to be seen, and for someone with borderline personality disorder, treatment often takes several years.

Shirley relinquished her parental rights to Haily and Daisy in 2007 and the children were adopted. Meanwhile, Shirley was running an escort service and had several women working for her.[2] Andrew was born in early 2008, but OCS took custody of him at ten days of age because Shirley had not engaged in OCS services and, after an unannounced home visit, Shirley's home was deemed unsafe for Andrew. Shirley's

---

[2]     Shirley has been convicted of prostitution twice.

parental rights to Andrew were eventually terminated and his paternal grandmother adopted him.

**B.     Shirley And Abigail**

Abigail was born in the spring of 2010.  In May 2011 an OCS investigator received a protective service report alleging that Shirley was physically abusing Abigail, prostituting from her home, and using drugs while breast-feeding.  Although OCS was unable to substantiate this report, OCS received another report in October 2012 and confirmed that Shirley was still or again engaging in prostitution.  Things came to a head in early November 2012; on November 1 and 2, OCS received several calls from Abigail's paternal aunt, who was babysitting Abigail.  Abigail had awoken with a fever, and her aunt gave her some cold medicine.  Several hours later, the fever spiked and they went to Providence Alaska Medical Center.  Abigail had a seizure on the way to the hospital.  Shirley arrived at the hospital and caused a scene.  Toxicology results indicated Abigail had been exposed to methamphetamine.  Because of concerns that Abigail's seizure was caused by a drug overdose, OCS scheduled a urinalysis (UA) for Shirley, but Shirley failed to comply.  Abigail's seizure was later believed to be caused by her high fever and a genetic condition.

An OCS representative met with Shirley to discuss her recent behavior. Shirley implied that she had stopped engaging in prostitution but had started again two months earlier because she needed money.  Shirley blamed Abigail's aunt for Abigail's suspected exposure to drugs.

On November 3 OCS filed an emergency petition for adjudication of child in need of aid and for temporary custody of Abigail alleging that Abigail was a child in

need of aid under AS 47.10.011(6), (7), (8), (9), (10), and (11).[3] Abigail was placed in foster care upon her discharge from the hospital. Six months later, OCS filed a petition for termination of parental rights on the grounds that Shirley had subjected Abigail to conditions or conduct described in AS 47.10.011(1),[4] (4),[5] (6), (9), (10), and (11); that Shirley had not remedied her conduct within a reasonable time; and that termination of Shirley's parental rights was in Abigail's best interests.[6]

## C.    Shirley's Behavior And OCS's Efforts

OCS transferred Shirley's case to protective service specialist Michelle Virden, who had been involved with Shirley and her children since 2004. Virden met with Shirley and initiated a case plan; this case plan followed a long line of case plans OCS had initiated with Shirley over the years. This plan, effective in January 2013, identified the following safety threats to Abigail: (1) there was no adult in the home

---

[3]    Alaska Statute 47.10.011 provides in pertinent part that the trial court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to: (6) substantial physical harm or risk of physical harm as a result of conduct by or conditions created by the parent; (7) sexual abuse or substantial risk of sexual abuse as a result of the parent's conduct; (8) conduct or conditions created by the parent resulting in mental injury or substantial risk of mental injury; (9) neglect created or caused by the parent; (10) the parent's substantial impairment or addictive or habitual use of an intoxicant resulting in harm or risk of harm; and (11) the parent's mental illness or serious emotional disturbance or mental deficiency placing the child at risk of harm.

[4]    Under AS 47.10.011(1), the trial court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been abandoned.

[5]    Under AS 47.10.011(4), the trial court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child needs medical treatment to cure, alleviate, or prevent substantial physical harm or is in need of treatment for mental injury and the parent has knowingly failed to provide the treatment.

[6]    Abigail's father relinquished his parental rights to Abigail in early 2013.

performing parenting duties; (2) Shirley was unable to control her behavior and lacked parenting skills; (3) Shirley was engaging in prostitution and drug abuse and was associating with other prostitutes and drug users; and (4) Shirley or someone she trusted with Abigail exposed Abigail to methamphetamine. During the meeting Shirley denied using methamphetamine. The case plan established goals that Shirley be a sober caregiver, have appropriate housing, make safe decisions for Abigail, manage her hostility, change her impulsive behavior, and address her victimization issues. Shirley indicated to Virden that she did not believe she had significant psychological problems and that she felt she had done everything she needed to do for OCS.

Shirley did not show up for a single scheduled UA despite the case plan requirements that she submit to UAs. Eventually OCS requested that Shirley submit to a hair follicle test to establish whether she was using methamphetamine during the time Abigail was hospitalized. Because Shirley refused, OCS had to obtain a court order for a hair sample test and UA. In March 2013 Virden drove Shirley to the lab for a hair follicle test, which was positive for methamphetamine.

Shirley actively avoided contact with OCS. She gave Virden an old address, which caused Shirley to miss a pre-arranged home visit. It was not until April 2013, after Shirley was arrested and charged with vehicle theft, assault, failure to stop at the direction of a police officer, and eluding a police officer, that Shirley showed any intention of getting Abigail back.[7] While awaiting disposition of the criminal case, Shirley was incarcerated at Hiland Mountain Correctional Center. During that time Virden and Shirley met to discuss options for substance abuse treatment and mental health therapy, and to develop a new case plan. Shirley began therapy and began taking

_____

[7]    After Shirley was arrested she informed OCS that she was involved with a dangerous person who she was concerned might retaliate against her and harm Abigail. To protect Abigail, OCS kept confidential Abigail's contact information.

medication to help control her moods and temper, and in compliance with the new plan, she participated in the prison's parenting classes, took her medication, and participated in services provided upon her release. The new plan also provided that clinical psychologist Dr. Melinda Glass would conduct a mental health evaluation, which took place while Shirley was incarcerated. Just as Dr. Rose had concluded in 2006, Dr. Glass concluded in 2013 that Shirley's mental illness, chaotic lifestyle, and parenting choices demonstrated her need for substance abuse treatment and long-term dialectical behavior therapy.

In August 2013 Shirley was released from Hiland Mountain to live in Sterling with Rae as her third-party custodian. Based on Dr. Glass's evaluation, Virden referred Shirley to Akeela House for a substance abuse assessment, but dialectical behavior therapy was not an option on the Kenai Peninsula. Although Virden did find a provider in Anchorage who would conduct the recommended therapy on a sliding fee scale, Shirley decided to go to Serenity House Treatment Center in Soldotna because of its proximity to Rae's home. But Shirley could not comply with the Serenity House outpatient treatment requirements because Rae was unable to drive her to all of her appointments or Shirley had to leave half way through her 90-minute appointments because Rae had other things to do. So when a bed became available in late November 2013, Shirley moved into Serenity House's residential treatment center. Shirley successfully completed residential treatment but was discharged from the program in January 2014 so she could attend the termination trial. She requested continuation of services to complete treatment after the termination trial. Shirley's primary counselor at Serenity House testified at trial that Shirley had made progress but would need more time to change; she was on step four of a 12-step program and required further intensive outpatient treatment. Dr. Glass similarly testified that based on her review of Shirley's

treatment records from Serenity House, Shirley still needed at least one year of dialectical behavior therapy and substance abuse treatment.

  **D. Abigail's Care And Placement**

  Abigail has significant special needs, including severe tremors, low muscle tone, delayed fine motor skill development, and symptoms of post-traumatic stress disorder (PTSD). Abigail has trouble moving from one activity or place to another; when she is in transition or among strangers, she freezes and needs a few minutes to figure out what is going on and whether she is safe, or she throws an intense, ear-piercing, screaming tantrum. OCS arranged neurological and neuropsychological examinations and an evaluation and services from Programs for Infants & Children. OCS tried to involve Shirley in Abigail's treatment but Shirley did not attend Abigail's medical and dental appointments or her numerous evaluations, therapy sessions, and education planning meetings.

  Abigail's foster mother, Mandy Reed, testified at trial about her qualifications as a licensed foster parent, her relationship with Abigail, and the care Abigail requires. Mandy has a master's degree in public health, and she works as a nurse for people with disabilities. She and her husband live with their two teenage sons and three foster children including Abigail. Mandy's testimony provided additional insight into Abigail's disabilities. Abigail has significant motor skill delays, speech delays, and dental problems. She cannot feed or dress herself because of her severe tremors and low muscle tone. She has trouble negotiating obstacles and frequently falls. Mandy testified that although Abigail is sweet and charming, she is hyper-vigilant about who is near her and what they are doing, and she is prone to running away. She is easily distracted and thus unaware of safety matters such as cars in the street.

  Abigail attends weekly play therapy through the Alaska Community Mental Health Services' child trauma project to address her PTSD and the resulting tantrums.

She also attends a special education preschool five mornings a week, as well as weekly speech therapy and occupational therapy. At home Mandy and Abigail work together on speech and occupational therapy. Abigail refers to Mandy as "mom" and enjoys being with the other family members and pets.

Before OCS filed the termination petition it considered placement possibilities for Abigail, taking into account her special needs and Shirley's preferences. Shirley requested that Abigail be placed with Rae. OCS agreed to investigate Rae's home as a placement option, but because OCS was advised that Rae was not considered Abigail's "grandparent" for placement purposes, OCS had not treated Rae as a grandparent and had not been in contact with Rae about Abigail until April 2013.[8] OCS denied Shirley's request and eventually placed Abigail in foster care with the Reed family in September 2013. Shirley renewed her motion for review of OCS's denial of her placement request in early September, just a few months before the termination trial.

### E. The Termination Trial, The Placement Hearing, And The Trial Court's Decision

A termination trial was held on January 21-23 and February 3, 2014, before Superior Court Judge Erin B. Marston. At that time, Shirley still had four felony charges pending, including vehicle theft, and she faced two to three years in prison if convicted. The court heard testimony from OCS representatives, doctors who had evaluated Shirley, Mandy, Shirley, and Rae. At the end of trial the court issued an oral decision terminating Shirley's parental rights to Abigail, followed by its written order memorializing its decision. The trial court found clear and convincing evidence that Abigail was a child

---

[8] As we discuss in part IV, OCS is required to place a child with an "adult family member," and "adult family member" is defined in pertinent part as "the child's 'grandparent.' " AS 47.14.100(e)(3), (t); AS 47.10.990(1)(A). Rae is Abigail's great-grandmother, and under a technical reading of the statutory definition, Rae is not a statutorily preferred placement.

in need of aid pursuant to AS 47.10.011(1), (4), (6), (9), (10), and (11); that Shirley failed to remedy the conduct or conditions that placed Abigail at substantial risk of injury; and that OCS made timely reasonable efforts to provide family support services towards reunification. The trial court also found by a preponderance of the evidence that termination of Shirley's parental rights to Abigail was in Abigail's best interests.

The trial court also conducted a placement review hearing at the conclusion of the termination trial and made findings regarding placement. In support of OCS's decision not to place Abigail with Rae, Virden explained that OCS had denied the request due to ongoing safety concerns, Shirley's long history of living in and out of Rae's home, and Abigail's special needs. Virden did not believe Rae could adequately meet Abigail's special needs, and she felt that Rae either did not understand or was in denial about Shirley's behavior and her children's needs. OCS previously had investigated requests and denied Rae placement of Shirley's other children for the same reasons.

Rae testified about her qualifications as a potential placement for Abigail and gave her opinion as to Shirley's parenting abilities. At the time of trial, Rae was 67 years old and believed she was in good health. She had worked for 23 years as a certified caregiver in Sterling taking care of a family friend with Down's syndrome. Her job required cooking, cleaning, helping with exercise, driving to and from medical appointments, paperwork, and general care.

Although Shirley had lived with Rae off and on for many years, Rae claimed that she was not aware of Shirley's drug problem. Nor did Rae accept as accurate Penny's autopsy report. Instead, she firmly believed that Penny died from carbon monoxide because the family truck emitted noxious fumes. Rae considered Shirley to be a very loving and good mother. Rae's testimony also revealed that she did not know the extent of Abigail's special needs or what would be required of her if she

had custody of Abigail. Although Rae did not explain how she would handle her current job and custody of Abigail, she said she would relocate to Soldotna if necessary to be near facilities for Abigail and would abide by any restrictions regarding contact with Shirley.

The trial court found clear and convincing evidence that continuing Abigail's placement in licensed foster care with the Reed family was appropriate and in Abigail's best interests, and that OCS did not abuse its discretion by denying placement with Rae. The trial court elected not to make a finding whether a great-grandmother falls under the statutory relative preference but instead found that OCS had good cause to deny placement with Rae, primarily because of Abigail's special needs and Rae's inability to meet those needs. Shirley appeals both the termination of parental rights and the trial court's upholding of OCS's placement decision.

## III. STANDARD OF REVIEW

In a child in need of aid (CINA) case, "we review the trial court's factual findings for clear error and its legal determinations de novo."[9] "Factual findings are clearly erroneous if, after a review of the entire record in the light most favorable to the prevailing party, we are left with a definite and firm conviction" that a mistake has been made.[10] "Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear

---

[9] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (citations and internal quotation marks omitted).

[10] *Id.* (citation and internal quotation marks omitted).

support for a trial court's ruling."[11]  Whether the trial court's factual findings satisfy the CINA statutes is a question of law.[12]

We review the superior court's finding of good cause to deviate from . . . placement preferences for an abuse of discretion."[13]  "It would be an abuse of discretion for a superior court to consider improper factors or improperly weigh certain factors in making its determination."[14]

## IV.  DISCUSSION

### A.  The Trial Court Did Not Clearly Err In Finding That Shirley Failed To Remedy Her Conduct Within A Reasonable Time.

Before terminating parental rights, a trial court must find by clear and convincing evidence that the parent has not remedied within a reasonable time the conduct or conditions in the home that placed the child at substantial risk of harm.[15]  Whether the parent has remedied the conduct is a factual determination best made by a trial court after hearing witnesses and reviewing evidence.[16]  A reasonable time is statutorily defined as "a period of time that serves the best interests of the child, taking

---

[11]  *Id*. (citation and internal quotation marks omitted).

[12]  *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 643 (Alaska 2013) (citing *J.S. v. State*, 50 P.3d 388, 391 (Alaska 2002)).

[13]  *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 431, 440 (Alaska 2013) (citing *In re Adoption of Sara J.*, 123 P.3d 1017, 1021 (Alaska 2013)).

[14]  *Id.* (quoting *Sara J.*, 123 P.3d at 1021).

[15]  AS 47.10.088(a)(2).

[16]  *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008-09 (Alaska 2011) (citation omitted).

in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[17] In determining whether a parent has remedied her conduct in a reasonable time, the trial court may consider any fact relating to the best interests of the child.[18] Where OCS has had significant involvement with a parent relating to the parent's previous children, we have upheld termination of parental rights even when the termination petition was filed very shortly after OCS took custody of the child currently at risk.[19] These decisions are made in light of the legislature's finding "that children undergo a critical attachment process before the age of six, and 'suffer tremendously when their bonding processes are interrupted.' "[20]

The trial court found clear and convincing evidence that Shirley failed, within a reasonable time, to remedy the conduct or conditions that placed Abigail at risk.

---

[17] AS 47.10.990(28).

[18] AS 47.10.088(b).

[19] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1251-52, 1263-64 (Alaska 2010) (affirming termination judgment where petition was filed one month after child's birth, based in part on trial court's finding that parent failed to remedy substance abuse issues in a reasonable time, given her history of substance abuse and relapses, the questionable degree to which she accepted her substance abuse problems, and the trial court's credibility findings); *see also Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 257-58 (Alaska 2013) (upholding trial court's finding of failure to remedy substance abuse, where the termination petition was filed three months after the child's birth, and the trial court found that the mother had a ten-year substance abuse history and relapses, failed to take concrete steps toward obtaining the long-term residential treatment required by her current case plan, and OCS had already spent several unsuccessful years working with the mother regarding her previous children).

[20] *Amy M.*, 320 P.3d at 259 (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003) (explaining that a child's need for permanency must reasonably limit the length of time accorded to the parent to remedy her behavior)).

The trial court was concerned that even though OCS took custody of Abigail in November 2012, Shirley did not start working her case plan seriously until she was arrested months later. Given Shirley's long history of OCS involvement and that she clearly knew or should have known what was expected of her to regain custody of Abigail, the trial court was disturbed that Shirley began a methamphetamine habit while she was on bail for felony charges. The trial court also pointed out that Shirley failed to comply with both Dr. Rose's 2006 recommendation of long-term individual therapy and cognitive behavior training, and Dr. Glass's 2013 recommendation of dialectical behavior therapy and long-term care. Based on Dr. Glass's evaluation and testimony, the trial court found that Shirley had not improved her life but in fact had made it worse, and she was in no condition to parent a child.

Shirley argues that the trial court erred in finding that she had not remedied the issues set forth in the petition in a timely fashion because she made substantial progress on her case plan but was not allowed sufficient time to engage meaningfully in treatment. Shirley maintains that at the time of trial, she was no longer was escorting or using drugs, and she was engaging in mental health counseling, substance abuse treatment, and parenting classes.

The record supports the trial court's finding of failure to timely remedy. Although it is true that OCS filed the termination petition only six months after taking custody of Abigail, the petition was based on OCS's many years of experience with Shirley involving her other children, followed by six months of Shirley's failure to participate in her case plan involving Abigail.[21] Before Shirley was incarcerated, she

---

[21]    *Cf. Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 853 (Alaska 2013) (upholding trial court's finding that mother failed to remedy her conduct in a reasonable time, based on the child's age and the
(continued...)

refused to participate in a single UA, and her court-ordered hair follicle test was positive for methamphetamine. She also failed to maintain regular contact with Abigail and actively avoided contact with OCS. Not only did Shirley continue to live a chaotic lifestyle and engage in criminal behavior, she also habitually used methamphetamine while Abigail was in OCS custody. It was not until Shirley's incarceration that she made any effort towards following her case plan and improving her life. While these recent changes are commendable, the trial court did not clearly err in finding that Shirley's efforts came too late, given the clear evidence of Abigail's age and significant special needs.

## B. The Trial Court Did Not Err In Concluding That OCS Made Reasonable Efforts Towards Reunification.

Before terminating parental rights, the trial court must find by clear and convincing evidence that OCS made timely, reasonable efforts to provide family support services to the child and parents designed to prevent out-of-home placement or enable the safe return of the child to the family home.[22] Whether OCS made reasonable efforts to promote reunification is a mixed question of law and fact.[23] OCS's statutorily mandated duties include the duty to: (1) identify family support services that will assist the parent in remedying her conduct; (2) actively offer and refer the parent to the services identified; and (3) document the department's actions.[24] OCS's duty to offer reunification services "is fulfilled by setting out the types of services that a parent should

---

[21](...continued)
parent's lack of progress); *see also Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1105-07 (Alaska 2011).

[22]     AS 47.10.086(a); AS 47.10.088 (a)(3).

[23]     *Emma D.*, 322 P.3d at 849 (citation omitted).

[24]     AS 47.10.086(a).

avail . . . herself of in a manner that allows the parent to utilize the services."[25] Reunification efforts need not be perfect; they need only be reasonable under the circumstances depending upon: the parent's substance abuse history, if there is one; her willingness to participate in treatment;[26] the history of services provided by OCS;[27] and the parent's level of cooperation with OCS's efforts.[28] The reasonableness of OCS's efforts may also depend on the parent's expressed interest in parenting, with OCS's responsibility for reunification efforts decreasing as the parent's interest decreases.[29] OCS's prior efforts on behalf of other children in the family are relevant to whether OCS has satisfied its requirements.[30]

Here, the trial court found clear and convincing evidence that OCS's efforts towards reunification were reasonable but unsuccessful. The court considered Shirley's history and prior involvement with OCS regarding her four other children, noting the multiple case plans and referrals for evaluation, treatment, and parenting classes. The

---

[25] *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008) (quoting *Frank E. v. State*, 77 P.3d 715, 720-21 (Alaska 2003)).

[26] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013) (citations omitted).

[27] *Audrey H.*, 188 P.3d at 679 n.35 (Alaska 2008) ("the determination of whether OCS made reasonable efforts may involve consideration of all interactions between the parent and OCS"); *see also Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1006 (Alaska 2011) (upholding an adjudication of children as in need of aid based in part upon OCS's prior contact with the family).

[28] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 953 (Alaska 2013) (citations omitted).

[29] *Audrey H.*, 188 P.3d at 679 (citation omitted).

[30] *Amy M.*, 320 P.3d at 260; *Sherman B.*, 310 P.3d at 953.

trial court pointed out that while OCS was attempting to develop a schedule to implement some structure in the children's lives, the parents were more interested in watching television. The trial court remarked that, through many case plans and for many years, OCS social workers provided Shirley with assistance, opportunities for counseling, referrals for substance abuse evaluation and treatment, and transportation to UAs.

Shirley argues that the trial court erred in finding that OCS made reasonable efforts because neither OCS nor the court took into account the limitations Shirley's cognitive impairments put on her ability to understand and comply with the case plan. Shirley argues that OCS should have tailored the plan to address her needs and intellectual abilities as documented by Dr. Rose and Dr. Glass, should have provided Shirley's treatment providers with the case plan, and should have provided Shirley with better ways to understand the plan, such as checklists. In support Shirley cites *Lucy J. v. Department of Health & Social Services, Office of Children's Services*, in which we addressed a mother's disabilities and stated that "[i]n order to 'take[] the client through the steps of reunification' in a way that will satisfy the active efforts requirement [under the Indian Child Welfare Act], OCS must reasonably tailor those steps to the client's individual capabilities."[31] Although the efforts required of OCS are less stringent in this case because it does not involve an Indian child,[32] OCS is nonetheless required to take into account the parent's limitations or disabilities and make any reasonable accommodations.[33]

---

[31] 244 P.3d 1099, 1116 (Alaska 2010) (second alteration in original) (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[32] *Compare* 25 U.S.C. § 1912(d) (2012), *and* CINA Rule 18(c)(2)(B), *with* AS 47.10.088(a)(3), *and* CINA Rule 18(c)(2)(A).

[33] *Lucy J.*, 244 P.3d at 1116 (citing *In re Terry*, 610 N.W.2d 563, 570 (Mich. (continued...)

The record supports the trial court's conclusion that OCS made reasonable efforts to reunite Shirley and Abigail and that OCS took Shirley's limitations into consideration in initiating and working through her case plans. Years before Abigail was born, OCS began providing Shirley in-home services, parenting training, a psychological evaluation, and case plan development, despite Shirley's apparent lack of interest. After taking custody of Abigail, OCS met with Shirley and developed updated case plans, arranged for drug testing, referred her to additional psychological evaluation and counseling, provided a bus pass, attempted a home visit, and visited her in jail on multiple occasions to continue services and generate case evaluations. OCS also provided Shirley with a referral to Akeela House for substance abuse assessments. Through the Department of Corrections, Shirley received additional parenting training, counseling and medication for her mental health treatment, a substance abuse assessment, and substance abuse therapy. Upon Shirley's release from incarceration, OCS provided referrals for the recommended long-term therapy and substance abuse treatment, paid for additional substance abuse assessments, and provided Serenity House copies of her most recent case plan and of Dr. Glass's report. OCS also arranged visits between Abigail and Shirley, provided Abigail with physical and psychological evaluations, arranged therapy and services, and provided for Abigail's medical needs. Shirley's case workers made sure that Shirley knew about the case plans and knew what needed to be done. As the trial court noted, Shirley had clear notice that she needed to change given the earlier termination of parental rights to her first two children. We conclude that the trial court did not err in determining that OCS's efforts were timely and reasonable.

---

[33](...continued)
App. 2000); *In re Antony B.*, 735 A.2d 893, 899 n.9 (Conn. App. 1999)).

**C.** **The Trial Court Did Not Clearly Err In Finding That Termination Of Shirley's Parental Rights Was In Abigail's Best Interests.**

Alaska Statute 47.10.088(c) requires a court to consider the best interests of the child in a proceeding involving termination of parental rights. Alaska Child in Need of Aid Rule 18(c)(3) specifies that a trial court may terminate parental rights only if it finds by a preponderance of the evidence that termination is in the child's best interests. In making a best interests determination, the trial court may consider any fact relating to the best interests of the child, including but not limited to:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[34]

The factors listed in the statute are not exclusive, and the trial court need not accord a particular weight to any given factor.[35]

The trial court found by a preponderance of the evidence that termination of Shirley's parental rights was in Abigail's best interests because of Abigail's undisputed special medical and mental health needs and her foster family's demonstrated ability to provide the support, love, and care Abigail needed. The court found that it was impossible for Shirley to meet Abigail's special needs care and moreover that Shirley did not seem to recognize the existence or extent of Abigail's special needs. Therefore,

---

[34]   AS 47.10.088(b).

[35]   *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

because of Abigail's struggles with transition and her need for routine, predictability, and a stable lifestyle, the trial court found that returning Abigail to Shirley would put Abigail in serious physical and mental jeopardy.

Shirley argues that the trial court erred in finding that termination of her parental rights was in Abigail's best interests because her offending conduct was short in duration given a child's overall life span. Shirley maintains that she never harmed Abigail, that Abigail's aunt was to blame for Abigail's hospitalization, and that Shirley had begun to cooperate with OCS and improve her life by receiving mental health counseling, going on medication, and moving into Rae's home which she claims was a stable environment.

The trial court's decision is supported by the testimony of OCS social worker Virden, who believed termination of Shirley's parental rights was in Abigail's best interests, and Dr. Glass, who believed Shirley's mental health conditions had worsened and would require at least one year of intense therapy and substance abuse treatment before she could potentially parent effectively. There was also abundant evidence that Abigail's foster family was skillfully managing Abigail's therapy and providing excellent care to Abigail. We therefore conclude that the trial court did not clearly err in determining which factors to consider in its best interests analysis and how much weight to give those factors, and in ultimately finding that termination was in Abigail's best interests.

D.      **The Trial Court Did Not Err In Upholding OCS's Decision Not To Place Abigail With Her Great-Grandmother.**

When a child is removed from a parent's home, OCS is required to place the child with an adult family member, absent clear and convincing evidence of good

cause to the contrary.[36]  The statute provides placement preferences as follows:

> (e) When a child is removed from a parent's home, the department shall place the child, in the absence of clear and convincing evidence of good cause to the contrary,
>
> (1) in the least restrictive setting that most closely approximates a family and that meets the child's special needs, if any;
>
> (2) within reasonable proximity to the child's home, taking into account any special needs of the child and the preferences of the child or parent;
>
> (3) with, in the following order of preference,
>
> (A) an adult family member;
>
> (B) a family friend who meets the foster care licensing requirements established by the department;
>
> (C) a licensed foster home that is not an adult family member or family friend;
>
> (D) an institution for children that has a program suitable to meet the child's needs.[37]

Alaska Statute 47.10.990(1) defines "adult family member" as "a person who is 18 years of age or older and who is (A) related to the child as the child's grandparent, aunt, uncle, or sibling; or (B) the child's sibling's legal guardian or parent."

Shirley argues that the trial court violated AS 47.14.100(e)(3) by placing Abigail with foster parents instead of Rae.  She argues that common sense dictates that a great-grandparent be included as a "family member" under the statutory placement

---

[36]     AS 47.14.100(e)(3)(A).

[37]     AS 47.14.100(e).

preferences.[38]  Shirley also argues that OCS failed to prove by clear and convincing evidence that it had good cause to deny placement of Abigail with Rae.

At trial OCS argued that there was clear and convincing evidence of good cause to deviate from the statutory priority list because Rae could not provide the level of care that would meet Abigail's significant special needs, and Mandy could.  OCS presented testimony that its decision to deny Shirley's placement request was based on current concerns that Rae's home was unsafe and that she was unable to provide the necessary care for Abigail's special needs.  The trial court found that OCS had not abused its discretion under AS 47.14.100(e) by placing Abigail with the Reed family.  The trial court also found that it did not need to make the determination whether a great-grandmother qualifies as an adult family member because clear and convincing evidence supported placement with the Reed family rather than Rae, due to Abigail's "extreme special needs," Mandy's "unbelievable commitment to . . . addressing those special needs, which is fantastic, and . . . [Rae's] true lack of recognition of . . . the special needs, and inability to meet those needs."  The trial court further noted its concern that Rae was "very angry" with OCS and joined Shirley in her belief that the problem was not Shirley's parenting but OCS's interference with their family.

We will generally consider a challenge to a termination order and a

---

[38]     Shirley also argues that OCS failed to provide clear justification for its decision not to place Abigail with Rae, failed to reconsider the placement, and waited too long to conduct the placement review hearing.  Shirley also asserts that OCS should have assisted Rae in maintaining contact with Abigail so the two could bond, which might ultimately have affected the placement decision.  Given the hostility OCS encountered in its efforts to communicate with Rae and the trial court's finding that OCS had good cause to deny placement with Rae, it is not likely that an earlier placement review hearing would have impacted the final result.

challenge to a placement decision separately.[39]  Although we recognize that placement

under AS 47.14.100(e) does take into account "the preferences of the child or parent,"

we question whether Shirley has standing to appeal the trial court's finding regarding

placement after termination of her parental rights;[40] Rae did not seek her own ruling and

has not appealed the placement decision.  And we question whether great-grandparents

are entitled to preferential relative placement under AS 47.14.100(e)(3).[41]  But we need

not resolve either of these issues.  Even assuming Shirley has standing to raise this

placement issue on appeal, and even assuming that Rae is a statutory relative, we

conclude that OCS presented clear and convincing evidence at the hearing supporting

the trial court's determination to uphold OCS's decision to deny placement of Abigail

with Rae.  OCS already had considered and denied Rae placement of Shirley's other

children because of home safety concerns.  Although Rae testified that those safety

---

[39]     *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 617, 625 (Alaska 2007) (refusing to review a placement review decision as part of a termination proceeding because the placement decision was a final and appealable order).

[40]     *Cf. In re Adoption of Keith M.W.*, 79 P.3d 623, 626 (Alaska 2003) (citation omitted) (questioning whether mother had standing to state a "parental preference" once her rights were terminated).

[41]     Before the legislature adopted the current language in AS 47.14.100(e), former AS 47.14.100(e) (2004) provided a preference for any "relative by blood or marriage" who requested placement of the child.  This broad language would have included a great-grandparent.  When the legislature amended the provision, it gave placement preference to "an adult family member," which it defined more specifically as a child's grandparent, aunt, uncle, sibling, or sibling's legal guardian or parent.  *See* ch. 64, § 34, SLA 2005.  The legislature could have expanded the preference, using "a member of the child's extended family" as the Indian Child Welfare Act does, *see* 25 U.S.C. § 1915(a)(1) (2012), but it did not.  OCS's position that "grandparent" does not include "great-grandparent" under the current version of AS 47.14.100(e) seems plausible, but we leave this issue open for a future case.

concerns had been addressed, Virden stated that concerns were ongoing in light of police reports in 2012 involving Rae's son, whom she believed still lived on the property.[42] It was also clear from Rae's own testimony that she did not recognize the extent of Abigail's special needs or Shirley's limitations as a parent. Rae maintained that Shirley had always been a good mother, that it was Shirley's poor choices in men that caused her problems, and that Shirley did not have a drug problem. It was up to the trial court to determine Rae's credibility and how much weight to give her testimony. Perhaps of greatest significance, evidence at trial showed that Shirley was unable to attend her own counseling sessions while she lived with Rae because of Rae's conflicting work schedule; if Rae could not consistently assist Shirley's needs to attend weekly 90-minute counseling sessions, it was not clear error for the trial court to conclude that Rae would be incapable of meeting Abigail's significantly greater daily needs.

V.    **CONCLUSION**

For the foregoing reasons, we AFFIRM the superior court's judgment terminating Shirley's parental rights to Abigail and upholding OCS's placement decision.

---

[42]    Shirley argues that after OCS denied Rae's request for custody of Shirley's other children, she made safety changes to her residence. But Virden testified that although Rae told her she had addressed a wiring issue, this did not resolve concerns that she was unable to protect Abigail or address her special needs.