NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CHLOE T., ) | |
| ) | Supreme Court No. S-16927 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-14-00228 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1710 – January 23, 2019 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate, and Chad Holt, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.   INTRODUCTION

The superior court terminated a mother's parental rights. The mother challenges the court's finding that the Office of Children's Services (OCS) made

---

\*      Entered under Alaska Appellate Rule 214.

reasonable efforts to reunify her with her daughter, arguing that visitation was inadequate because the mother did not receive the regular in-person and Skype visits that the court had ordered as a condition of the daughter's placement with an out-of-state relative.

We agree that visitation fell short of what was required. However, viewing OCS's efforts in their entirety — as we are required to do — we conclude that the superior court did not clearly err in finding that OCS made reasonable efforts to reunify the family.

## II. FACTS AND PROCEEDINGS

Chloe T. is the mother of Agatha, who was born in 2012.[1] OCS's first contact with Chloe was in March 2013, following allegations of substance abuse leading to child neglect. OCS took custody of Agatha in June 2014, after her father physically and sexually assaulted Chloe in Agatha's presence.

Chloe had a decade-long history of criminal conduct and substance abuse, complicated by "diagnostic impressions of multiple mental illnesses." Her difficulties with substance abuse continued after OCS took custody of Agatha. OCS made three case plans that included a variety of efforts to assist Chloe: referrals for housing and case management services, public assistance, parenting classes, domestic violence awareness classes, psychological evaluations, cognitive behavior therapy and dialectical behavior therapy, a "managing your emotions" group, disease-management assistance, and transportation assistance. OCS also referred Chloe for substance abuse treatment through Dena A Coy's inpatient program (which she attended) and later, at Chloe's request, through the Akeela House. OCS required weekly urinalysis testing, though Chloe often missed it.

---

[1] We use pseudonyms to protect the family members' privacy.

For the first seven months after removal, Agatha was placed with a foster family in Anchorage, and Chloe visited weekly when her circumstances allowed. By early 2015 Chloe was having unsupervised visits for seven hours at a time. In January 2015, however, OCS sought to place Agatha with her paternal aunt, Tabitha Y., in South Carolina.

The superior court temporarily stayed the placement pending a review hearing, which was held in February and March 2015. Chloe argued that moving Agatha to South Carolina would amount to a "de facto termination" of Chloe's parental rights because of its inevitable effect on visitation. OCS contended that it could satisfy the reasonable visitation requirement by allowing Chloe "to contact her child via [S]kype, telephone calls, and quarterly in-person visits paid for by OCS."

At the close of the placement hearing, the court found that Chloe had a "very guarded prognosis" because of her "long-term substance abuse history, prior attempts and failures at substance abuse rehabilitation, all overlaid with a serious personality disorder, antisocial disorder, [and] bipolar condition"; that it was reasonable for OCS to anticipate that Chloe's attempts at recovery would fail; and that it was therefore in Agatha's best interests to be placed soon with a family member who was interested in adoption. The court noted that "quarterly in-person visits are not an illusory or ineffective means of visitation" in the meantime. The court further noted that weekly Skype visits would be "appropriate, and [would be] a better solution than telephones. It's the only solution for a two-year-old."

Approximately two years later, trial on the termination of Chloe's parental rights was held over the course of five days from April to July 2017. Tabitha testified about the arrangements for visitation while Agatha was in her care: "We were to come to Alaska every quarter to see [Chloe], and then . . . [Agatha would] have contact with [Chloe] over the phone." Asked about Skype, Tabitha testified that "it wasn't required,

but . . . if it was available, [I would] be willing to do it with her." She reiterated: "But [Skype] wasn't required; just the phone contact was required." Tabitha testified that Agatha and Chloe had twice-weekly phone calls, which Chloe was supposed to initiate; the consistency of this schedule "fluctuated." OCS left the logistics to Chloe and Tabitha; an OCS supervisor testified that "[Chloe] and the foster parent were told several times that [Chloe is] supposed to be following through with telephone calls, FaceTime, Skype, anything that can be offered."

As for the quarterly in-person visits, the record does not show how many actually occurred, and the court made no specific findings on the subject following trial.[2] Agatha was moved to South Carolina around March 2015. OCS paid for her to come back to Alaska in June 2015 and again around Halloween of that year. Tabitha testified there was a visit in January or February 2016 and then another in May 2016 (though a social worker testified there were no visits between Halloween 2015 and the end of March 2016). There was evidence that OCS offered to fly Chloe to South Carolina in September 2016 but Chloe declined the offer.[3] A visit scheduled for October 2016 was delayed because of security concerns[4] and took place in November instead. A visit planned for February 2017 did not occur because the OCS social worker had to stay

---

[2]     The court made a general finding that "OCS provided visitation for [Chloe] and [Agatha]."

[3]     Chloe's brief places this offered visit in 2017, but that would have been after the termination trial. The social worker assigned to the case from February to October 2016 testified that she offered to fly Chloe to South Carolina in August or September, and an OCS supervisor confirmed that it was this particular social worker who had made the offer.

[4]     An OCS social worker testified that OCS required the presence of security during Chloe's visitation because in September 2016 Chloe had unlawfully taken her other child from foster care.

home with a sick child; the social worker noted that it "wouldn't have been ideal" conditions for a visit anyway because Chloe was incarcerated at the time. The social worker also testified that she suggested rescheduling the visit to March, but her supervisor refused on grounds that "the family contact that's set up [hadn't] been consistent" and "it wasn't fiscally responsible for OCS to book a flight when [the] termination trial was coming up." OCS did, however, schedule a final visit in June 2017, in between sessions of the termination trial.

The superior court issued a written order terminating Chloe's parental rights. The court found that Agatha was a child in need of aid under both AS 47.10.011(10) (parental substance abuse) and .011(11) (parental mental illness); that Chloe's substance abuse and mental illness placed Agatha at substantial risk of harm; that Chloe had failed, within a reasonable time, to remedy the conduct that placed Agatha at substantial risk of harm; that timely and reasonable efforts had been made to prevent the breakup of the family; and that it was in Agatha's best interests to terminate Chloe's parental rights and free Agatha for adoption by her aunt. Chloe now appeals, challenging only the superior court's "reasonable efforts" finding.[5]

III.   STANDARD OF REVIEW

"Whether OCS [has] made reasonable efforts to promote reunification is a mixed question of law and fact."[6] Factual findings are reviewed for clear error; clear error occurs when the court has a " 'definite and firm conviction' that a mistake has been

---

[5]     Chloe raised three other points on appeal which were not briefed and which we therefore consider abandoned. *See Union Oil Co. of Cal. v. State, Dep't of Revenue*, 677 P.2d 1256, 1259 n.6 (Alaska 1984).

[6]     *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015).

made."[7]  "Whether the trial court's factual findings satisfy the CINA statutes is a question of law."[8]

## IV.  THE SUPERIOR COURT DID NOT ERR IN FINDING THAT OCS MADE REASONABLE EFFORTS.

Before terminating parental rights, the superior court must find by clear and convincing evidence that OCS made "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed . . . to enable the safe return of the child to the family home."[9]  Chloe argues that the superior court's decision to allow Agatha's placement in South Carolina was expressly premised on OCS's provision of Skype, telephone, and quarterly in-person visitation, and because "the quarterly visits were not done in a timely manner and the Skype visits never happened," OCS's efforts cannot be considered reasonable.[10]

We agree with Chloe's point that regular visitation both in person and via Skype was essential to the superior court's approval of OCS's decision to place Agatha with her Aunt Tabitha in South Carolina.  It is troubling that the aunt was plainly under the impression that Skype was merely an option rather than a requirement, an impression OCS neither detected nor corrected.  OCS inexplicably abdicated much of its responsibility during this period to monitor the situation in which it had placed a child

---

[7]      *Id.* at 1239 (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[8]      *Id.*

[9]      AS 47.10.086(a); CINA Rule 18(c)(2)(A).

[10]      We reject as moot Chloe's related argument that "Agatha should never have been sent to South Carolina" because proper application of the statutory priorities should have resulted in a placement closer to home.  An order terminating parental rights generally "renders earlier issues of placement moot." *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 10 (Alaska 2003).

entrusted to its care. We are also troubled by the apparent failure of quarterly in-person visitation and the haphazard nature of the evidence showing when the less-frequent visits actually occurred.

The evidence did show, however, that Chloe had consistent in-person visitation with Agatha for the first seven months' of OCS custody, twice-weekly phone calls after the child's move to South Carolina (except when Chloe failed to initiate the calls), and some in-person visits during that time. We cannot say that the superior court's finding that "OCS provided visitation for [Chloe] and [Agatha]" is clearly erroneous. More importantly, visitation is only part of the reasonable efforts analysis. Chloe does not challenge the superior court's findings about OCS's considerable and persistent efforts over the course of three years to address her substance abuse and mental health problems.

It is well established that "a court considers the state's reunification efforts in their entirety."[11] "The efforts that OCS makes must be reasonable but need not be perfect."[12] For example, in *Barbara P.* we affirmed a reasonable efforts finding when OCS made "no effort to provide [the father] with visitation with his children when he was incarcerated [for 9 months]," because he had visitation at other times and was receiving other assistance with the problems that led to removal.[13] Here, although visitation following Agatha's placement in South Carolina was inadequate when measured against what the superior court expressly anticipated, we cannot say that

---

[11] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[12] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012) (quoting *Audrey H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008)).

[13] 234 P.3d at 1261-63.

OCS's efforts "in their entirety" were unreasonable. The superior court did not clearly err in its reasonable efforts finding.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Chloe's parental rights.