NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

## THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SID G., | ) | |
| | ) | Supreme Court No. S-16015 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-00130 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1577 – April 6, 2016 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Lars Johnson, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Janell Hafner, Assistant Attorney General, and Craig W. Richards, Attorney General, Juneau, for Appellee. Marika R. Athens, Assistant Public Advocate, and Richard K. Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

## I. INTRODUCTION

This appeal arises from the superior court's termination of a father's parental rights under the Indian Child Welfare Act (ICWA). The father argues that the

---

\* Entered under Alaska Appellate Rule 214.

superior court erred in finding that he had failed within a reasonable time to remedy the conduct that made his son a child in need of aid (CINA). In support of his argument the father asserts that three of the superior court's underlying factual findings were not supported by evidence in the record. Because we conclude that the superior court's findings were not clearly erroneous and the superior court did not err in finding that the father failed to remedy his conduct in a reasonable time, we affirm the superior court in all respects.

## II.    FACTS AND PROCEEDINGS

Joe is the three-year-old son of Sid and Chris.[1] Joe is an Indian child for purposes of ICWA.[2] Chris relinquished her parental rights and is not a party to this appeal.

### A.    Sid's History

Sid, who is in his late forties, began to abuse alcohol at a young age, and he has continued to succumb to alcohol abuse and violent behavior for much of his life. Sid has pleaded guilty or no contest to many violent and alcohol-related crimes, including domestic violence and assault. And while Sid has pursued treatment for his substance abuse and anger management issues for more than a decade, even completing some treatment programs, his efforts have ultimately proved unsuccessful.

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    *See* 25 U.S.C. § 1903(4) (2012) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."). Chris is a member of the Native Village of Unalakleet, and the tribe intervened in this case.

**B. Office of Children's Services Involvement**

Joe was born in January 2013. At that time, Sid, Chris, Joe, and Chris's three older children were living with Chris's parents. In February 2013 the Office of Children's Services (OCS) received a domestic violence report involving Sid and Chris. Sid asserted that he punched Chris in self-defense after she bit him during an argument. Chris was arrested for assaulting Sid,[3] and as a result of this incident, OCS began investigating the family. Interviews with family members, including Chris's older children, revealed that Sid and Chris drank and fought and that Sid "beat[] up on" Chris.

A second domestic violence incident occurred in March 2013 when, according to the police report, Sid punched Chris twice in the face in the presence of the children. Sid told Tamara Wilson, the OCS caseworker working with the family at that time, that during both domestic violence incidents, he and Chris were "just . . . arguing."[4] Chris told the police that both she and Sid had been drinking before the assault. Sid was arrested, pleaded no contest, and was incarcerated.

OCS held a team decision meeting in April and developed a safety plan to keep Chris's children, including Joe, safe while remaining with Chris in her parents' home. Sid, who was incarcerated at the Cordova Center halfway house at the time, wanted the children to remain with Chris's parents. Chris's parents agreed to participate to help protect the children from Chris's drinking and any domestic violence.

Two days after the team decision meeting, OCS filed a non-emergency petition for CINA adjudication and temporary custody. The following day, Wilson met

---

[3]     The State asserts that Sid, not Chris, was arrested as a result of the altercation. The record clearly supports that Chris, not Sid, was arrested.

[4]     At a screening interview with a substance abuse program in June 2013, Sid said that he and Chris had been "arguing about their relationship" and "pushing each other."

with Sid to provide him with a copy of the petition and give him resources to address substance abuse and domestic violence. Sid told Wilson that he was receiving daily counseling at the Cordova Center, attending Alcoholics Anonymous, and that he wanted to attend substance abuse treatment.

By June 2013 Sid was no longer at the Cordova Center, and he and Chris were living together again. OCS caseworker Stephanie Claiborne testified that OCS remained concerned about Sid's untreated substance abuse. Claiborne met with Sid in June and July. Claiborne developed a case plan and testified that she discussed the plan with Sid, who asserted that he wanted to be sober and to address his domestic violence issues. The case plan identified Starting Point and the Cook Inlet Tribal Council's program, Fathers' Journeys, as services that could help Sid address his substance abuse and domestic violence issues. Claiborne also made referrals for a substance abuse assessment with Insight Therapy and for services with Access to Recovery through the Southcentral Foundation.

Later in June Sid followed up on Claiborne's assessment referral to Insight Therapy. During the assessment Sid maintained that he had previously wanted to stop drinking, but that he now drank up to 12 beers at a time, noting that his attempts to abstain from alcohol in the past had been unsuccessful. Yet, he referred to alcohol as a "very minor problem" in his life. And despite their history of domestic violence, Sid described his relationship with Chris as "very good." Insight Therapy determined that Sid had a problem with alcohol abuse and recommended that he attend outpatient treatment.

Claiborne testified that when she met with Sid in July, he said he was going to make his treatment a "top priority" and that he had a therapy appointment scheduled. But in August OCS received a report of another domestic violence incident in which Sid had assaulted Chris in front of one of her children. The police report from that incident

alleged that Sid and Chris were drinking under a bridge and that one of Chris's children was with them when Sid punched Chris in the face in front of the child. Chris was arrested for child endangerment after failing field sobriety and breathalyzer tests.

After the August incident, an OCS caseworker interviewed each of Chris's older children, who reported that Sid and Chris had failed to maintain sobriety and that domestic violence in the home had not ceased. Sid was not living in Chris's parents' house after the August incident, but OCS believed that he and Chris were continuing their relationship. At a team decision meeting later that month, OCS developed a new safety plan that required Chris to leave her parents' home and the children to remain with Chris's parents. But eventually Joe was placed in foster care because Chris's parents found they were unable to care for a baby.

Claiborne testified that while she tried to contact Sid after the August incident, she was unable to reach him because he was homeless. In November the superior court concluded that Joe continued to be a child in need of aid. In December Sid pleaded no contest to assaulting Chris, and he was once again incarcerated. While incarcerated Sid received weekly visitation with Joe.

In April 2014 OCS caseworker Diana Richmond began working with the family. Sid had recently been released from the Cordova Center, but on April 2 he was arrested again for assaulting Chris, and in May he pleaded no contest to that assault.[5] Richmond was unable to locate Sid for a meeting until June, when she discovered that he was at the Parkview Center halfway house. During their meeting Sid said that he was trying to set up substance abuse treatment at Jett Morgan Treatment Services. He also

---

[5] There is evidence in the record that alcohol was involved in this assault. In a substance abuse assessment Sid reported that he had not used alcohol since 2013, but the Department of Corrections indicated that Sid's April 2014 arrest was for an alcohol-related assault charge.

told Richmond that he and Chris were still in a relationship and that she wrote him letters and visited him at Parkview. Richmond referred Sid for services and had him submit information releases so he could get an assessment. She also set up visitation between Sid and Joe.

In July Sid participated in a substance abuse assessment at Cook Inlet Tribal Council. While Sid claimed that he had not consumed alcohol since 2013, he was diagnosed with alcohol dependence and the assessment recommended intensive outpatient treatment. The assessment also noted that Sid would benefit from courses addressing relationship and domestic violence issues.

OCS updated Sid's case plan in July and again in August. In the July case plan OCS continued to encourage Sid to address his substance abuse, domestic violence, and parenting issues. Yet in the August evaluation, OCS characterized Sid's progress as "minimal" because he had not met with a caseworker to discuss treatment options, had not engaged in domestic violence services, and appeared to lack the skills necessary to engage with Joe. In this evaluation, OCS characterized Sid as a high-risk safety threat because he was unable to control his violent behavior, had not made changes since Joe was taken into OCS custody, and was "just beginning to address his substance abuse and domestic violence concerns."

Shortly after the case plan was updated, Sid participated in a behavioral health assessment. The assessment noted Sid's pattern of alcohol abuse and relapse and his history of domestic violence and assaults. Sid reported that he had not used alcohol since March 2014 and stated that he knew he needed to receive treatment to get Joe back. He also expressed his intent to reenter Alcoholics Anonymous, save money for an apartment, and address his anger management issues. The assessment diagnosed Sid with alcohol dependence, stated that there was a "high likelihood" of relapse without

close monitoring and therapeutic services, and recommended intensive outpatient treatment.

In August Sid began treatment with Akeela, where he enrolled in outpatient substance abuse and anger management courses. Richmond met with Sid again in August, and Sid acknowledged his history of domestic violence against Chris. Richmond testified that she met with Sid again in September and that at that point, he was actively engaging in his treatment with Akeela. He had achieved six months of sobriety and reported that he had a sponsor at Parkview with whom he was meeting daily. While Sid acknowledged his past mistakes, he did not share OCS's concern about his relationship with Chris and told Richmond that he and Chris were "doing better."

In October OCS filed a petition for termination of Sid's parental rights. OCS recognized that Sid had completed the substance abuse assessment with the Cook Inlet Tribal Council and recently had begun services with Akeela. But it also noted that he had been referred for other treatment options and that his incarceration for the domestic violence assault against Chris had precluded his participation in most of the recommended services.

Richmond spoke with Sid by telephone in October and November and met with him in person again in December. By that time Sid had almost completed his treatment program with Akeela, and he was scheduled to be released from Parkview in mid-December. Richmond testified that Sid expressed confidence in his sobriety and planned to get an apartment and a job upon his graduation from treatment and release. Sid completed his treatment program with Akeela, but Richmond did not hear from him after his release.

In late December Sid was arrested for assaulting a female relative. Anchorage police officer Tomas Franjul testified that Sid appeared intoxicated during the incident and struck the woman in the face because she said something "bad to his

wife." Sid pleaded guilty to the assault and was incarcerated again. According to Richmond, Sid acknowledged that he had been drinking before the assault, but at the termination trial he testified that he had not been drinking. Richmond did not speak with Sid again until April 2015. At that point, he was incarcerated at Goose Creek Correctional Center, and Richmond and Sid spoke by telephone to discuss treatment options available to Sid at Goose Creek.[6]

### C. The Termination Trial

The superior court held a termination trial on June 19, 2015. Sid participated telephonically because he was still incarcerated as a result of the December 2014 assault.

#### 1. Sid's testimony

At the termination trial Sid acknowledged his past alcohol dependence diagnoses and explained that he had undergone multiple assessments, participated in treatment programs, and had completed treatment at Akeela. He admitted that he had resumed drinking even after completing that program but asserted that he deserved another chance to parent Joe because he loved Joe and had a sincere desire to change.

Sid also testified that during his incarceration at Goose Creek he had enrolled in a parenting class, was participating in a talking circle, and was looking into participating in an anger management class. Noting that he expected to be released approximately two months after the termination trial, and recognizing his past failures to maintain sobriety after outpatient treatment, Sid testified that his plans upon release included an inpatient alcohol treatment program. He also testified that he planned to

---

[6] Richmond testified that during their conversation in April, Sid indicated that he was willing to relinquish his parental rights to Joe because he "wanted [Joe] to be in a good home." In May Sid signed a relinquishment, which was approved by the superior court, but Sid later withdrew his relinquishment.

make arrangements for anger management treatment and to continue participating in a talking circle after his release.

Sid recognized that he had been incarcerated for half of Joe's life and asserted that upon release he planned to get a job and an apartment and look for daycare for Joe. Sid had not seen Joe since December 2014 and testified that he hoped to see him as much as possible after his release. Sid also expressed a desire to resume visitation with Joe prior to his release.

Sid emphasized at the termination trial that he loved Joe, wanted Joe and his family to come first, and did not want Joe to suffer. He asserted that he was willing to work to improve himself to get Joe back. Sid recognized that he had pleaded no contest or guilty to multiple domestic violence assaults against Chris, but he blamed alcohol abuse for their past difficulties and asserted that he planned to continue his relationship with her.

### 2. OCS caseworkers' testimony

Wilson, Claiborne, and Richmond, the three caseworkers who worked with Sid and his family over the course of OCS's investigation, also testified at the termination trial. Wilson testified that in April 2013 Sid claimed that he was participating in Alcoholics Anonymous and receiving counseling and that he planned to begin treatment. She also reported that interviews with Chris's children confirmed that Sid was using alcohol and committed acts of domestic violence in the home.

Claiborne testified that when she met Sid, his substance abuse remained untreated despite his previous assurances. She also noted that Chris's children continued to report alcohol abuse and domestic violence in the home. Claiborne felt that Sid had made only minimal progress on his case plan during the time she worked on his case.

Finally, Richmond testified that although she had set up visitation for Sid and Joe, Sid missed some visits and appointments scheduled by OCS during October.

Richmond also observed that despite Sid's efforts, Joe had difficulty warming up to Sid. While she acknowledged Sid's engagement in services and completion of his treatment program at Akeela, Richmond noted that Sid had relapsed into problems with alcohol and violence soon after his release from the program.

### 3. Foster parent's testimony

Joe's foster father testified that he and his partner had cared for Joe since he was eight months old and that Joe had visited with Sid approximately 11 times. The foster father also observed that Joe did not appear to interact easily with Sid during their visits and that Joe never asked for Sid. The foster father testified that he wants to adopt Joe and that he had taken steps toward adoption.

### 4. Expert testimony

April Stahl, an ICWA mental health expert, testified that despite Sid's undisputed love for Joe, she did not believe that Sid would be able to safely parent Joe given his history of alcohol abuse and violence. She explained that Sid's pattern of alcohol abuse, incarceration, and domestic violence were clearly not good for Joe, who required permanency. Citing Sid's completion of multiple treatment programs followed by relapses, Stahl testified that it was not reasonable to expect Sid to succeed in his next attempt.

### D. The Superior Court Terminates Sid's Parental Rights.

At the close of the termination trial the superior court found that (1) Joe was a child in need of aid due to Sid's abandonment, domestic violence, and substance abuse; (2) Sid had not remedied those conditions within a reasonable time; (3) OCS had made reasonable active efforts toward reunification; (4) terminating Sid's parental rights was in Joe's best interests; and (5) returning Joe to Sid's care would likely result in Joe suffering serious physical or emotional harm.

The superior court noted that despite "getting through" treatment on multiple occasions, Sid had quickly relapsed and each time was apparently "not learning" from treatment. While noting that it was not finding that Sid had "no hope," the superior court explained that it was unwilling to risk returning Joe to Sid's care. Finally, the superior court commented that Sid's plans upon release were insufficient, noting that "the only plan . . . [for] when you get out is reentering into an extremely violent relationship" with Chris. The superior court subsequently entered a written order terminating Sid's parental rights.

## III. STANDARD OF REVIEW

"In a CINA case, 'we review the trial court's factual findings for clear error and its legal determinations de novo.' "[7] "Whether a parent failed to remedy conduct or conditions that placed the child at substantial risk of harm is a factual finding."[8] " 'Factual findings are clearly erroneous if, after a review of the entire record in the light most favorable to the prevailing party, we are left with a definite and firm conviction' that a mistake has been made."[9] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record

---

[7] *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 430 (Alaska 2015) (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[8] *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1268 (Alaska 2014) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[9] *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1239 (Alaska 2015) (quoting *Emma D.*, 322 P.3d at 849 (citation omitted)).

provides clear support for the superior court's ruling."[10]  "Whether factual findings satisfy the requirements of the applicable [CINA] statute is a question of law that we review de novo."[11]

## IV.    DISCUSSION

Sid challenges three of the superior court's underlying fact findings:  (1) that Sid had not learned from treatment; (2) that Sid was not amenable to further treatment; and (3) that Sid did not have a plan of action after his release.  Sid then argues that because these findings were erroneous, the superior court also erred in concluding that Sid had received a reasonable amount of time to remedy his conduct.  We conclude that the superior court did not clearly err in any of its underlying fact findings, that the superior court did not need to rely on those challenged findings to conclude that Sid had failed to remedy his conduct in a reasonable time, and that the superior court's failure-to-remedy finding was not clearly erroneous.

### A.    The Superior Court's Underlying Fact Findings Were Not Clearly Erroneous.

In its oral findings at the conclusion of the termination trial, the superior court told Sid that while Sid "know[s] what to say . . . to get through," he was "not learning" from past mistakes.  The superior court also remarked that while Sid had made some efforts to change, he "didn't follow through."  Sid argues that the superior court clearly erred in finding that Sid had not learned from treatment because over time he began to show that he understood the harmful effects of his drinking and domestic

---

[10]     *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 167 (Alaska 2015) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[11]     *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 837 (Alaska 2015) (citing *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 920 (Alaska 2011)).

violence. Sid emphasizes that by the termination trial he recognized his need for "more comprehensive treatment" and understood that his drinking was the root cause of his violent behavior.

Based on a review of the record as a whole, we cannot conclude that the superior court clearly erred in finding that Sid had not learned from his treatment. The superior court correctly noted that even after completing treatment programs, Sid consistently reverted to alcohol abuse and violence. Sid's history of cycling through treatment and then relapsing was undisputed, and the superior court was apparently not persuaded by Sid's testimony at the termination trial that he had finally learned from treatment and was at last prepared to change his behavior accordingly. In light of Sid's history of alcohol abuse and domestic violence, despite completing multiple treatment programs, the superior court did not clearly err in its finding that Sid had not learned from treatment.

Sid also argues that the superior court erroneously found that he was not amenable to additional treatment. But the record demonstrates that the superior court recognized that Sid was "trying to change" and the court expressly stated that it was not "finding that [Sid] ha[d] no hope." The superior court did not err in its findings on Sid's amenability to treatment.

Finally, Sid challenges the superior court's finding that Sid did not have a "real plan[]" upon release aside from returning to his "extremely violent relationship" with Chris. Sid argues that in fact he had a developed plan "to pursue inpatient treatment through Southcentral Foundation, reconnect with a former Alcoholics Anonymous sponsor, pursue anger management counseling, attend talking circles, and find employment so that he could provide for Joe's needs. Sid contends that he "demonstrated a cohesive plan" at trial and that he "deserved the opportunity to act on that plan and show that he could succeed."

Sid is correct that the superior court did not specifically address all of the steps Sid testified that he would take when released. But reviewing the record as a whole and in light of Sid's past failed attempts to overcome his issues through treatment, the superior court could reasonably have determined that Sid's plan was unlikely to result in success and thus that it was not, in the words of the superior court, a "real plan" on which the court could rely. We therefore find that the superior court did not clearly err in finding that Sid lacked a sufficient plan upon his release.

**B.      The Superior Court's Underlying Challenged Findings Were Not Necessary To Support The Finding That Sid Failed To Remedy The Conduct That Rendered Joe A Child In Need Of Aid.**

Alaska Statute 47.10.088(a)(2) provides that to terminate parental rights a court must find that the parent

> (A)    has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
>
> (B)    has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury . . . .

"In making this [failure-to-remedy] determination, the court may take into account any fact relating to the best interests of the child,"[12] including the five best interests factors enumerated in the CINA statute.[13] "The superior court is entitled to rely on a parent's

---

[12]      *Chloe W.*, 336 P.3d at 1268 (citing AS 47.10.088(b)).

[13]      *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010) ("[T]he superior court . . . is permitted to 'consider any fact relating to the best interest of the child, including' the statutory factors, when evaluating whether a parent has remedied his or her conduct." (quoting AS 47.10.088(b))). The five statutory best interests factors are:

(continued...)

documented history of conduct as a predictor of future behavior."[14]

"A reasonable time is statutorily defined as 'a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments.' "[15] "[T]his determination must be made on a case-by-case basis and the amount of time considered 'reasonable' will vary."[16]

Sid argues that by the time of trial he understood what he needed to do to change his behavior and that in light of this growth, termination of his parental rights deprived him of a reasonable time in which to remedy his conduct. He contends that "[w]hen a parent has a plan and a demonstrated interest in pursuing necessary treatment,

---

[13](...continued)

    (1)    the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

    (2)    the amount of effort by the parent to remedy the conduct or the conditions in the home;

    (3)    the harm caused to the child;

    (4)    the likelihood that the harmful conduct will continue; and

    (5)    the history of conduct by or conditions created by the parent.

AS 47.10.088(b).

[14]    *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1274 (Alaska 2014) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003)).

[15]    *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1240 (Alaska 2015) (quoting AS 47.10.990(28)).

[16]    *Christina J. v. State, Dep't of Health & Soc Servs., Office of Children's Servs.*, 254 P.3d 1095, 1108 (Alaska 2011).

the parent should have the time to do so" and argues that the superior court's allegedly erroneous underlying fact findings led the court to a flawed legal conclusion that Sid had a reasonable time in which to remedy his conduct.

But as the State argues, Sid failed to remedy his behavior over a long period of time and during the entirety of OCS's involvement. In a similar case, we held that while a mother's "stated intention to complete treatment, her sobriety while incarcerated, and her attendance at [substance abuse] meetings were all positive developments," those changes were "very recent."[17] In that case, the superior court found that despite the mother's recent efforts, she had failed to remedy her conduct within a reasonable time.[18] In this case the superior court, properly relying on Sid's history, has come to the same conclusion. In light of Sid's long-standing history of alcohol abuse and domestic violence, the superior court did not err in finding that Sid failed to remedy his conduct.

## V.    CONCLUSION

Because the superior court's challenged underlying fact findings were not clearly erroneous, and because the superior court correctly concluded that Sid had failed to remedy his conduct in a reasonable time, we AFFIRM the superior court's termination of Sid's parental rights.

---

[17]    *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[18]    *Id.*