NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| EMMA D., | ) | |
| | ) | Supreme Court No. S-16104 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-14-00043 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | No. 1588 – June 15, 2016 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. David T. Jones, Senior Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

## I.     INTRODUCTION

A mother appeals the termination of her parental rights to her son, arguing that the superior court erred in finding that she failed to remedy the conduct or conditions that caused her son to be a child in need of aid. But the court reasonably relied on expert

---

\*       Entered under Alaska Appellate Rule 214.

testimony that the mother's untreated mental illness impeded her ability to parent. And the court reasonably concluded that the mother's failure to make progress on her mental health issues was due to her failure to consistently engage in services until it was too late. Because the superior court's findings are not clearly erroneous, we affirm its termination of the mother's parental rights.

## II. FACTS AND PROCEEDINGS

This appeal involves the termination of Emma D.'s parental rights to Jared D.[1] Jared's putative father, Hank W., lives in Wisconsin and appeared telephonically at the initial probable cause hearing; an attorney was appointed to represent him at that time. He made no further court appearances after that hearing and is not involved in this appeal.

### A. Emma's History

Emma has an extensive history of mental health issues dating to her childhood. She was physically and sexually abused as a child by family members and has been physically abused as an adult. She spent four years at an inpatient treatment facility in Texas for psychiatric treatment as a teenager and also received inpatient treatment at the Alaska Psychiatric Institute. She has a history of self-harm and suicide attempts. Emma has also struggled with substance abuse and has stated that both of her parents abused drugs. At the termination trial she testified that she has abused alcohol and has experimented with marijuana, cocaine, prescription opiates, and heroin.

Emma's first contact with the Office of Children's Services (OCS) was in August 2011 after the birth of her first son, Joey. After receiving several protective services reports regarding Joey's poor health and nutrition and observing neglectful and harmful parenting behavior by Emma, OCS assumed protective custody of Joey in

---

[1] We use pseudonyms for family members to protect the parties' privacy.

February 2012. OCS then provided Emma with a case plan that largely focused on stabilizing her mental health; it provided that she would undergo a psychiatric evaluation, participate in case planning with a mental health caseworker, receive counseling and medication management, and secure stable housing. Emma began receiving services at Anchorage Community Mental Health Services, but she had difficulty following through with treatment referrals and maintaining a stable medication regimen. As a result, the superior court terminated Emma's parental rights to Joey in April 2013 on the basis of mental illness and neglect. We later affirmed the termination, noting Emma's failure to complete her case plan and her "long history of mental health issues and her life-long difficulties in establishing an effective and sustainable treatment regime."[2]

After her parental rights to Joey were terminated, Anchorage Community Mental Health Services involuntarily discharged Emma due to nonparticipation. Emma lived in Wisconsin for several months in 2013, but she did not engage in any mental health services during her time there. She returned to Alaska in December 2013 but did not receive any medication or therapy until July 2014, save for a single mental health assessment via phone.

## B. Initial OCS Involvement

Emma gave birth to Jared in May 2014. After reports from hospital staff that Emma was displaying "explosive behaviors" necessitating Jared's removal from her room, OCS assumed emergency custody of Jared in the hospital. OCS notified Hank of its assumption of custody via telephone. Less than a week after Jared's birth, OCS filed an Emergency Petition for Adjudication of Child in Need of Aid and Temporary Custody, citing abandonment, neglect, and mental illness. Both parents appeared at the

---

[2] *Emma D. v. State, Dep't of Health & Human Servs., Office of Children's Servs.*, 322 P.3d 842, 853 (Alaska 2014).

initial probable cause hearing; Hank appeared telephonically. Emma then stipulated to a finding of probable cause that Jared was a child in need of aid on the basis of mental illness without an admission of fact. The court issued an order requiring that Jared remain in OCS's temporary custody and later issued an order adjudicating Jared a child in need of aid on the basis of neglect.

OCS caseworker Jeanni Angus began working with Emma in June 2014. Angus consulted the OCS caseworker who had overseen Emma's case involving Joey and learned that Emma had a pattern of failing to complete mental health treatment. That month Angus met with Emma twice to prepare a case plan. They discussed Emma's goals for the case plan; Angus later testified that Emma "really kind of wrote her own case plan." The case plan required that Emma: (1) undergo a physical exam; (2) obtain a mental health assessment, a psychological evaluation, and a psychiatric evaluation and follow all recommendations; (3) regularly engage in individual therapy and follow all recommendations; (4) engage in anger management classes; (5) participate in parenting classes; and (6) enroll in continuing education courses.

Angus gave Emma referrals to aid her in accomplishing her case plan goals. She referred Emma to HeartReach in Wasilla for free parenting classes, to Mat-Su Behavioral Health for therapy and medication management, and to Dr. Bruce Smith for a psychological evaluation. And because Emma had trouble securing reliable transportation to Anchorage,[3] Angus provided her with bus passes and, on occasion, cab vouchers so she could obtain services and attend visitation with Jared.

## C. Emma's Mental Health Efforts

Emma failed to consistently engage in mental health services for the majority of the time Jared was in OCS's custody. Emma began receiving behavioral

---

[3] At this time Emma was living in Wasilla with her grandmother.

health services at Mat-Su Health Services in July 2014 but was ultimately discharged for not attending appointments. Emma met with Elana Shiflea at Mat-Su Health Services to create a treatment plan. Shiflea recommended that Emma work with her caseworker, attend counseling, and receive medication management. Shiflea planned to meet with Emma weekly for individual therapy, but Emma did not attend any subsequent appointments, so Shiflea closed her chart in early September due to nonparticipation.

That July Emma also underwent a psychiatric evaluation by nurse practitioner Kristen Hammer at Mat-Su Health Services. Emma admitted to Hammer that her mental health was not under control and that she experienced manic episodes that prevented her from sleeping for days. Hammer diagnosed Emma with bipolar disorder, post-traumatic stress disorder, opioid dependence in remission, and alcohol dependence in remission. Hammer recommended that Emma receive psychiatric medication and participate in individual therapy. Though Emma began to receive medication from Hammer, by December 2014 she was no longer taking it. Emma failed to schedule any further appointments after November and was subsequently discharged from Mat-Su Health Service's medication services. After her final visit with Hammer, Emma did not receive medication again until June 2015.

In September 2014 Emma met with Angus for an administrative review. During this meeting Emma reported that she disliked taking her medication because it caused fatigue. She also stated that she was no longer taking any medication but later denied making this statement during her testimony at the termination trial. Emma also informed Angus that she had moved from Wasilla to Anchorage due to family conflict and would be restarting services in Anchorage.

Later that month Emma met with Dr. Smith for a psychological evaluation. Dr. Smith diagnosed Emma with bipolar disorder and post-traumatic stress disorder and with opioid and alcohol dependence in remission. For treatment he recommended she

maintain her medication regimen, engage in therapy, and obtain a job and use her income to establish a stable residence.

Angus and Emma also discussed her progress in January 2015. Emma reiterated her earlier statement that she disliked taking her medication because it caused fatigue. Angus reminded her that she had a limited time in which to make progress and needed to reengage with services as soon as possible. Since her medication services at Mat-Su Health Services had been discontinued due to nonparticipation, Emma asked Angus for a referral to Akeela so she could receive medication there. Angus provided the referral and Emma had a mental health assessment at Akeela in March with mental health assessor Emilie Van Haeke.

During the assessment Emma acknowledged that she had "a lot of unresolved mental health issues," it was a fight to stay sober, and she needed help managing her anger. Van Haeke diagnosed Emma with post-traumatic stress disorder and bipolar disorder. She recommended that Emma participate in individual and group therapy to address these disorders. She also recommended that Emma obtain a psychiatric evaluation and comply with the recommended medication management regimes.

Holly Harman, a caseworker for OCS, was assigned as a secondary worker for Emma out of the Anchorage office in January 2015. Harman attempted to reach Emma several times during January and February but was unable to make contact with Emma until March 4; they arranged to meet that day. During the meeting Emma and Harman discussed Emma's case plan, referrals, and progress. Emma told Harman that she had stopped receiving services at Mat-Su Health Services because she could no longer afford the services and it would not accept her insurance. She also stated that she had stopped taking her medication in December. The next day Harman emailed Emma referrals to anger management courses, free parenting classes at Father's Journey, and

medication management services at a facility that accepted her insurance. Emma responded that day confirming that she had received the email.

In April OCS caseworker Lisa Hubbard, who took over from Harman as the secondary worker on Emma's case, met with Emma to discuss her progress. Emma told Hubbard that she was having difficulty paying for medication, but Emma said she believed she was managing well without medication or counseling. And though she had previously asked Angus for a referral to Akeela, Emma told Hubbard she wanted a referral to a different treatment program, one with a Christian emphasis or one in the Mat-Su Valley. Hubbard did not provide any additional referrals because she believed that Emma needed to follow through with the existing referrals.

Hubbard and Emma met again in May. Emma again said she no longer wished to receive services at Akeela and could not afford classes at Akeela or counseling without OCS's assistance. Hubbard explained that low-cost counseling options were available in Anchorage, where Emma was living at the time, but Emma stated that she preferred a service in the Mat-Su Valley. After this May meeting Hubbard did not have contact with Emma again until the termination trial in August. Hubbard attempted to reach Emma by mail and phone in the interim, but Hubbard did not hear back from Emma. Angus also attempted to call Emma in May but was also unsuccessful.

Later in May Emma had an initial mental health assessment at Anchorage Neighborhood Health Services, which offered her a sliding scale fee arrangement. She began receiving medication from that health center around June — the first time she had been on a medication regimen since at least December of the prior year — and was seeing a psychiatrist once per month to receive medication at the time of the termination trial.

In June Emma began participating in weekly anger management classes. Upon Emma's request OCS paid her referral fee for the class, but Emma paid the weekly

fee. The course facilitator testified that Emma attended every class, participated frequently, and completed all assignments. In July Emma attempted to obtain therapy from Anchorage Community Mental Health but was told they were not currently accepting new clients. In August she contacted Mat-Su Health Services regarding therapy. She testified that she decided to reengage because she had a job and could possibly afford the program's sliding scale fee, but ultimately she was unable to afford it.

### D. Emma's Parenting Efforts

Emma also made uneven progress on her parenting goals. She initially visited Jared twice per week,[4] but OCS cancelled visitation in October 2014. Emma explained that OCS cancelled the visits because she did not notify Alaska Family Services, where she was visiting Jared, about her arrest for failing to complete community service in an unrelated matter. Visitation resumed in January 2015, but Emma missed at least three visits that month and then lost contact with OCS for several weeks. When weekly visitation resumed in March, Emma cancelled at least twice and the foster mother also cancelled on a few occasions. At the time of the termination trial in August, Emma had attended 16 visits with Jared since January of that year.

Emma occasionally displayed troubling behavior during her visitation with Jared. She was sometimes late to visitation, and both the OCS supervisor and Jared's foster mother expressed concern about Emma's excessive cell phone use while visiting. The OCS supervisor was also concerned about Emma's focus on what Emma perceived to be Jared's physical ailments, which distracted her from interacting and bonding with

---

[4] The record is unclear on exactly when visitation began.

him.  But the supervisor also observed Emma engaging in many positive parenting behaviors during these visitations, like showing affection and bringing toys and snacks for Jared.

Emma also failed to complete a parenting course.  Emma attended two parenting classes at HeartReach in Wasilla but stopped attending when she moved to Anchorage.  She expressed concerns to her OCS caseworkers about not being able to afford a parenting course, so they referred her to free parenting courses at HeartReach and Father's Journey.  However Emma was not interested in these classes and instead expressed interest in attending classes at Alaska Family Services, where classes sometimes required a fee.

### E.  Emma's Efforts On Other Case Plan Goals

Emma's case plan set several goals in addition to those regarding mental health.  It set a goal of obtaining stable housing, but at the time of the termination trial Emma's housing arrangements were still in flux.  A few months before the trial, Emma had moved in with her father and his girlfriend in the Mat-Su Valley — even though OCS had determined that his home was not an appropriate placement for Jared due to her father's "[e]xtensive . . . history" of child protective services reports and his criminal history including domestic violence and drug use.  She testified that she planned to get an apartment of her own and stated that she needed approximately two more paychecks before she could afford to do so.  The case plan also called for Emma to obtain employment.  In June 2015 Emma began working at a fast food restaurant in Palmer, earning between $700 and $1,000 per month.  Before that she had been unemployed since 2013.

## G. Termination Trial

In March 2015 OCS filed a petition to terminate Emma's parental rights to Jared on the basis of mental illness and neglect.[5] The court held a termination trial over four days in August 2015.[6] At the time Jared was 15 months old, he had been in OCS's custody since he was three days old, and had been in the same foster home for the duration. The court heard testimony from several OCS representatives who had worked with Emma, mental healthcare professionals who had treated Emma, Jared's foster mother, Emma's father's girlfriend, and Emma. Jared's guardian ad litem was present at the trial and advocated for termination of Emma's parental rights.

Emma testified regarding her progress on her case plan goals and her willingness to further engage with the case plan. She testified that she had been on a medication regimen since June which lowered her anxiety and stabilized her mood; the only negative side effect was drowsiness. She also testified that she had no plans to discontinue her current medication regimen and that she believed her mental health was currently in control. But she acknowledged that there were times throughout the case when she had failed to maintain her medication regimen, contrary to her case plan goals.

Emma also admitted that she had failed to complete several aspects of her case plan including an anger management program and a parenting class. She acknowledged that, though required by her case plan and repeatedly recommended by mental health evaluators, she was not engaging in individual therapy. She agreed that she could benefit from therapy "in certain areas" but explained that she did not believe

---

[5] AS 47.10.011(9), (11).

[6] In July Emma moved to continue the trial, arguing that her ability to comply with her case plan had previously been limited by financial constraints and lack of reliable transportation. She argued that she was currently reengaging in the plan due to her changed circumstances. The court denied this motion.

that therapy was worthwhile because it focused on the past rather than the future. She stated that she would be willing to engage in individual therapy if OCS paid for it and "if it meant [she would] get [her] son back."

Dr. Smith, who had performed Emma's psychological evaluation, testified at the termination trial as an expert in clinical psychology. He testified that consistent medication and therapy were typical treatments for treating and managing Emma's diagnoses of post-traumatic stress disorder and bipolar disorder and that it would be difficult for Emma to achieve positive results without these treatments. Dr. Smith further testified that none of Emma's diagnoses prevented her from being a parent, but he explained that people with such diagnoses are "not as able to be attentive" to their children and cannot make "responsible judgments in terms of parenting" without treatment.

Angus, one of Emma's OCS caseworkers, also testified at the trial about her interactions with Emma and Emma's case plan progress. She stated that Emma "started services with vigor, but . . . ha[d] difficulty following through." Angus explained that OCS could not even consider a trial home visit for Jared with Emma until Emma had completed six to nine months of consistent medication management and individual therapy; given Emma's history it was not realistic to expect her to achieve such consistency in the near future. Angus testified that she believed adoption was in Jared's best interests and that if the court terminated Emma's parental rights, Jared's foster home presented a potential permanent home for him.[7]

---

[7] Jared's foster mother testified that she would be willing to adopt Jared were he to become available for adoption.

The next month the superior court entered an order terminating Emma's parental rights.[8] Emma appeals.

## III. STANDARD OF REVIEW

Whether a parent failed to remedy the conduct or the conditions that placed the child at substantial risk of harm is a factual finding by the superior court which we review for clear error.[9] A finding is clearly erroneous "if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[10]

## IV. DISCUSSION

Emma appeals the superior court's finding that she failed to remedy the conduct or conditions that caused Jared to be a child in need of aid within a reasonable period of time. She argues that rather than terminating her parental rights after the termination trial, the court should have stayed the termination trial and allowed her more time to complete her case plan.

In order to terminate parental rights, the superior court must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[11] "Whether the parent has remedied the conduct is a factual determination best made by a trial court after hearing witnesses and reviewing

---

[8] The superior court also terminated Hank's parental rights on the grounds of abandonment. AS 41.10.011(1).

[9] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[10] *Id.* at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[11] AS 47.10.088(a)(2)(B).

evidence."[12] Alaska Statute 47.10.088 provides that a superior court "may consider any fact relating to the best interests of the child" including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[13]

## A. The Superior Court Did Not Clearly Err In Concluding That Emma Failed To Remedy Her Conduct.

Emma argues that the court erred in finding that she failed to remedy her conduct. She contends that "by the time of termination [she] was engaged in her case plan" and through considerable effort had made progress on her case plan goals. She claims that testimony at the trial demonstrated that she was taking a stable medication regimen, participating in regular anger management classes, living in stable housing, attending visitation regularly, planning to enroll in parenting classes, and willing to engage in therapy.

The superior court found by clear and convincing evidence that Emma had not remedied her mental illness and the neglectful behavior that placed Jared in need of aid. It found that Emma was "unable to meet her own mental health needs on a consistent basis" because she had stopped taking her medication for several months, had not seen a therapist, and was "reluctant to address her past trauma." It also found that

---

[12] *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1240 (Alaska 2015).

[13] AS 47.10.088(b).

her attendance at visitation with Jared had been "inconsistent" and that even when in attendance she sometimes displayed "troubling" behaviors. In addition the court noted Emma's "significant history of substance abuse," her lack of "safe, stable housing," and her failure to complete a parenting course "[d]espite multiple referrals" from OCS. Given these findings the court concluded that Emma's "history of instability, her inability to control her mood and anger, and her lack of consistent treatment of her mental health places [Jared] at continued substantial risk of physical harm or mental injury."[14]

The record supports the superior court's finding that Emma failed to remedy her conduct — namely her untreated mental illness — that had placed Jared at substantial risk of harm. Testimony and exhibits at the termination trial demonstrated that Emma was inconsistent in engaging with the services that mental health providers repeatedly recommended and that were components of her case plan, including medication management, parenting classes, and individual therapy. She failed to attend her weekly individual therapy appointments at Mat-Su Health Services and as a result was discharged from therapy for nonparticipation after just one appointment.

Emma never undertook individual therapy in the 15 months that Jared was in OCS custody before the termination trial, even though mental health professionals recommended it and her case plan required it. She also failed to complete a parenting

---

[14] The superior court did not explicitly mention the best interest factors in AS 47.10.088(b), but it was not required to. *See* AS 47.10.088(b) ("In making a [failure to remedy] determination . . . , the court *may* consider any fact relating to the best interests of the child . . . ." (emphasis added)); *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1009-12 (Alaska 2011) (noting that the superior court "did not specifically discuss AS 47.10.088(b)" but nevertheless affirming its failure-to-remedy determination). Regardless, the superior court's findings and conclusions in this case align with those factors.

course despite multiple referrals to free courses and ultimately attended only two parenting classes in the 15-month duration of her case. And by December 2014 Emma had stopped taking her medication and did not resume again until June 2015 — even though a stable medication regimen was an integral part of her recommended treatment and her case plan required it.

In part Emma blames her failure to remedy on her lack of financial resources and reliable transportation. She argues that without money or medical insurance she was unable to obtain these recommended mental health services and resources until she obtained a job. But the record reveals that Emma's inconsistent engagement and attendance was a more significant factor in her failure to remedy her conduct than her financial and transportation constraints. Emma was offered free or low-cost medication management from Mat-Su Health Services even without insurance for a brief period in October and November 2014. This offer was only discontinued after she missed several scheduled appointments.

Emma displayed a reluctance to maintain her medication management regimen, telling OCS caseworkers that she did not like taking her medication because it caused fatigue and that she was managing well without it. And her failure to engage in therapy appears to stem in part from her belief that it was not worthwhile, rather than her inability to afford it. As for parenting classes, there were no financial barriers to enrolling; OCS repeatedly referred her to free parenting classes at Father's Journey and HeartReach. OCS also provided Emma with bus passes and cab vouchers to address her transportation concerns.

Emma notes that she was making significant progress on her case plan in the few months immediately prior to the termination trial. In these months she obtained a job, resumed medication management, and started attending weekly anger management classes. However even with these steps Emma had not progressed on several aspects of

her case plan by the time of the termination trial, including securing stable, safe housing, engaging in individual therapy, participating meaningfully in parenting classes, and attending continuing education classes. And by the time Emma started engaging with her case plan in earnest, Jared had been in OCS's custody for more than a year.

When a parent fails to make progress for the majority of time OCS has been involved in the case, steps taken immediately before a termination trial are not necessarily entitled to dispositive weight. For example we have acknowledged a parent's "seemingly sincere efforts toward recovery [from substance abuse] in the weeks before [the termination] trial" but concluded that the parent had failed to remedy her conduct in a reasonable amount of time "in light of her forgone opportunities to remedy her conduct in the preceding seven months."[15] We accordingly affirmed the termination of the parent's parental rights.[16] Similarly Emma's progress in the few months before trial does not obviate her failure to engage in her case plan for the majority of time Jared was in OCS custody.

## B. Emma Was Given A Reasonable Amount Of Time In Which To Remedy Her Conduct.

Emma appears to acknowledge that she was not ready to regain custody of Jared at the time of trial; she notes that she "was not asking to immediately have Jared returned to her" and contends that the court acted "unreasonabl[y]" when it did not provide additional time to work on her case plan.

Under AS 47.10.990(28) a reasonable time is "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments." Reasonable

---

[15] *T.F. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1093 (Alaska 2001).

[16] *Id.*

time is not defined by "a specific number of months or by reference to parents' needs";[17] it is a fact-specific determination based on the child's needs. Because children undergo a critical attachment process before the age of six and "suffer tremendously when their bonding processes are interrupted," a reasonable amount of time is often shorter for younger children.[18] A parent's history also may be relevant to determining what constitutes a reasonable amount of time.[19]

Jared was 15 months old at the time of the termination trial and, with the exception of the few days immediately following his birth, he spent his entire life in the same foster home. The court did not explicitly find that Emma had been given a reasonable amount of time to remedy her conduct, but it did conclude Emma "ha[d] not demonstrated any stability and commitment towards making good mental health care decisions that would allow her to safely parent [Jared] at any time in the foreseeable future." The court further concluded that, given Jared's young age, he needed "the stability of a permanent home and a safe and nurturing environment in order to have a chance to succeed in life" and that Jared's foster home was "ready to provide [him] with [that] home."

The record supports these conclusions. Emma testified that she had not engaged in therapy for the duration of the case, was not currently engaging in therapy,

---

[17]     *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1107 (Alaska 2011).

[18]     *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003); *see also* AS 47.05.065(5) ("[N]umerous studies establish that . . . children undergo a critical attachment process before the time they reach six years of age . . . ."); *Christina J.*, 254 P.3d at 1107 (citing AS 47.05.065(5)).

[19]     *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 258 (Alaska 2013).

and did not desire to engage in therapy. Yet Dr. Smith testified that it would be difficult for Emma to meaningfully change her behavior without individual therapy. And Angus testified that she would not even consider suggesting a trial home visit for Jared with Emma until she completed six to nine months of consistent medication management and individual therapy.

The superior court also considered evidence from Emma's first case with OCS, which involved issues similar to those here including lack of medication management and unstable moods.[20] The court heard testimony that Emma had exhibited the same pattern of starting and stopping mental health treatment and services in that case. The court's findings and conclusions note that Emma previously subjected her older son to neglect and accordingly had her parental rights to him terminated. The court could rely on this evidence to conclude that she would not remedy her conduct in the foreseeable future.[21] Further a parent's CINA history may shorten what constitutes a reasonable time in a later CINA case: "Where OCS has had significant involvement with a parent relating to the parent's previous child[], we have upheld termination of parental rights even when the termination petition was filed very shortly after OCS took custody of the child[]."[22] OCS petitioned to terminate Emma's parental rights to Jared nearly 11 months after it took Jared into custody and the court held the termination trial more than four months after OCS filed the petition. We have recognized a parent's history with OCS and a parent's pattern of problematic behavior as factors supporting the

---

[20]    *See Emma D. v. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 844-46 (Alaska 2014).

[21]    *Amy M.*, 320 P.3d at 258 ("[A] parent's history is relevant to whether a parent has remedied her conduct in a reasonable time.").

[22]    *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1240 (Alaska 2015).

termination of parental rights even though the termination trial was held shortly after OCS assumed custody.[23]

In light of evidence about the considerable progress Emma still had to make before Jared could be placed with her, evidence from Emma's prior case with OCS, and Jared's young age and need for stability, it was not clear error for the superior court to find that Emma would not be able to safely parent Jared in the foreseeable future and thus would not remedy her conduct in a reasonable amount of time.

## V. CONCLUSION

The superior court did not clearly err when it found that Emma failed to remedy her conduct in a reasonable amount of time. We therefore AFFIRM the superior court's order terminating her parental rights.

---

[23] *See, e.g.*, *Amy M.*, 320 P.3d at 255-56, 259-60, 262 (affirming termination of parental rights where termination trial was held eight months after OCS assumed custody, noting "superior court correctly considered the interactions between OCS and Amy over three years — both prior to and after [the child's] birth"); *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1251-52, 1260-61 (Alaska 2010) (affirming termination of parental rights where termination trial was held about one year after OCS assumed custody, noting mother's history of relapses and sporadic treatment after OCS involvement).