NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LINUS L., ) | |
| ) | Supreme Court No. S-16394 |
| Appellant, ) | |
| ) | Superior Court Nos. 4FA-14-00095/00096 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & ) | |
| SOCIAL SERVICES, OFFICE OF ) | No. 1647 – August 9, 2017 |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Elizabeth W. Fleming, Kodiak, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

## I.     INTRODUCTION

The superior court terminated a father's parental rights, finding that his children were in need of aid on five different grounds, including mental illness. The father, who has bipolar disorder, appeals the mental illness finding and the court's

---

\*        Entered under Alaska Appellate Rule 214.

finding that the Office of Children's Services (OCS) made reasonable efforts to reunite the family. He also argues that the superior court plainly erred in conditioning his fundamental right to parent on his taking psychotropic medication without first making findings that psychotropic medication is in his best interests. Finding no error, we affirm the superior court's order terminating the father's parental rights.

## II.     FACTS AND PROCEEDINGS

Linus L. is the father of Carry and Puck.[1] Carry turned 14 during the termination trial, and Puck was 16. Linus's girlfriend lived with Linus and his children starting in March 2014.[2] OCS removed the children from the home in August 2014.

### A.     OCS's Involvement With The Family

OCS first became involved with the family in July 2012. Linus hit Puck with a spoon, and it left a bruise on his thigh. Someone reported the bruise to OCS and OCS investigated. An OCS worker advised Linus not to spank his children and to find other means of discipline. Linus testified that he said he would accept any help OCS could give. OCS closed the case soon thereafter.

OCS became involved with the family again in March 2014. Linus hit Carry with his belt, which left a welt on her thigh. Carry called the police. OCS and Linus agreed to a protective action plan. Linus agreed to stop spanking his children.

On the morning of August 4, 2014, Linus discovered that Carry had run away the previous night. He found her with other children in a tent in a neighbor's yard. Linus attempted to force her to come back with him, and she struggled with him. Carry

---

[1]     Pseudonyms have been used to protect the parties' privacy.

[2]     The mother did not have meaningful contact with the children during the time period relevant to this case. She voluntarily relinquished her parental rights and does not appeal.

went to the hospital with shoulder and head injuries, and Linus was arrested for assault. OCS removed the children from the home.

**B.    OCS's Services To The Family**

In March 2014 OCS referred Linus to the Resource Center for Parents and Children's (Resource Center) "scream-free parenting class" and to Presbyterian Hospitality House's "parenting love and limits" class. Linus never completed either class. OCS also referred Carry to Family-Centered Services of Alaska for counseling.

After they were removed, Carry and Puck, who are special needs children, were placed with two sisters who served as their foster parents. One of the foster parents works with special needs children at Carry's school and had interacted with her there. The foster parents made improvements to their property to accommodate the children. They put an addition on their house and a big fence around their property to ensure that the children did not go into the road. All parties liked the foster parents. Linus testified that the foster parents were "the only blessing in this whole thing," and Katie Dabney, the OCS caseworker assigned to the case, said "[i]f [she] could place all children with them, [she] would." The foster parents are a pre-adoptive placement for both children.

Linus told OCS that he had been diagnosed as having bipolar disorder. After the children were removed, Dabney arranged and paid for Linus to see Irmgard Romine, a mental health counselor. Linus attended an initial intake session and another four sessions with Romine before he stopped participating because he felt they were unnecessary. Dabney testified that OCS would have continued to pay for counseling sessions. Dabney also testified that she offered to find him a different counselor or to pay for any counselor of his choosing, but he did not take her up on this offer.

Later Linus started seeing a therapist, Sarah Koogle, and a psychiatrist, Dr. Joshua Sonkiss, but did not inform OCS because he felt that anything he told OCS would be used against him. He explained that he went to Fairbanks Memorial Hospital

because a nurse practitioner there had been very helpful and had given him a prescription for medication years before. He asked Dr. Sonkiss for a prescription for Seroquel, and Dr. Sonkiss provided it. Seroquel is a medication used to treat psychotic disorders that is only effective when taken daily. It also causes sleepiness, and Linus used it as a sleeping aid as needed. Linus also testified that it was his understanding he could take Seroquel as needed for his bipolar disorder. He testified that he saw Koogle every three months. He explained that he benefited little from these sessions but that seeing her every three months kept him in the hospital system so it would be easier to get help from the hospital in the future.

Dabney also referred Linus to the Resource Center for a program that included parenting education classes, one-on-one parent coaching, and more visitation than OCS provided. Linus attended for about a year and had visitation twice a week with Puck for 74 visits. But he was removed from the parenting class after he "consistently challenged . . . and criticized" the teacher and "other individuals in the class said they didn't feel like it was a safe place if [Linus] was present." According to Linus, the class teacher did not understand that parenting children of different ages required different techniques. He also said the one-on-one parenting teacher was "a young gal who was very sweet, a college kid, that would make a great babysitter." Kristen McKay, who supervises visitations at the Resource Center, testified that Linus was not willing to recognize that the educators in the program had valuable insights for him and was not willing to participate in the education process. He was eventually discharged from the program because he reached the maximum benefit the program could offer. McKay explained that Linus did not believe any of the parental education portions of the program would help him and that the visitation was only happening in "a very, very consistent controlled environment. And so because of that, it was determined that [Linus] had reached the maximum benefit of what [the Resource Center] [was] able to

offer him at that time." The Resource Center did not have any classes for parents of adolescents or parents of special needs children when Linus attended. But the Resource Center provided Linus referrals to parenting classes outside of the Center. There is nothing in the record to suggest Linus went to any other parenting classes.

OCS offered supervised visits with Puck at OCS, but Linus refused to participate in visitation if it was to be supervised. He said he wanted unsupervised visits in the community. Dabney spoke with one of the foster parents about supervising visits in the community, but determined the foster parents were not equipped to handle those visits. Linus continued to have telephone contact with Puck. At the start of the trial Linus had not visited with Puck in person in the few weeks since he was dismissed from the Resource Center, but near the end of trial Linus testified that he had started supervised visits at OCS.

In December 2014, as a result of well-child checks when OCS took custody of the children, a doctor recommended Carry have her tonsils removed. Linus stated that Carry could be making up symptoms to get attention or that the doctor could be trying to get money by performing an unnecessary operation, and he refused to consent to the procedure. Linus later may have changed his mind, but OCS relied on consent from Carry's mother to eventually go forward with the operation. Linus also refused OCS's request for consent to allow Carry to take psychiatric medication.

OCS wanted Linus to undergo a parental risk assessment and Linus's attorney agreed. OCS referred him to Dr. Marti Cranor, an expert in providing psychological and parental risk evaluations and assessments, and Linus completed the assessment. Linus's attorney also arranged for Linus to see Elizabeth Pawelko, an expert in mental health counseling and evaluations, for a parental risk assessment. Linus did not inform OCS about this assessment. When Dabney found out, she asked for a release of information, but Linus refused to provide one.

OCS continued to provide Carry with therapy services. She saw four therapists. Both Carry and Puck saw Dr. Christopher Brown for psychological testing. He determined that Carry had oppositional defiant disorder and a learning disability in reading and written expression. OCS considered placing Carry in Family-Centered Services' inpatient program, but her behavior improved while living with the foster parents, so OCS decided against it. OCS also obtained a remain-in-placement order for her after she began leaving her foster parents' home and school without permission.[3] She did not attempt to run away again.

Dabney testified that at the beginning of the child in need of aid (CINA) case OCS could not arrange visitation between Linus and Carry because of Linus's ongoing criminal assault case. Once the criminal case was dismissed, Linus emailed Dabney asking to have visits with Carry. Dabney called Carry's therapist, and the therapist recommended the contact start slowly because of the earlier trauma to Carry. Dabney told Linus that he should start contact with Carry with cards and letters, which she explained is typically what is done for parents who have not had contact with their children for significant periods of time. Linus sent Carry letters. According to Dabney, Carry went back and forth on whether she wanted to see her father. Eventually Linus and Carry started weekly family therapy sessions with Carry's therapist. Linus testified near the beginning of trial that he had been attending these therapy sessions for almost one month.

---

[3]     In December 2014 the superior court found that Carry "ha[d] left placement and for some period of time her whereabouts [had been] unknown" and that she "place[d] herself in situations which pose[d] a severe and imminent risk to her safety and wellbeing." It therefore ordered Carry to remain in her foster placement and said, "[I]f [she] again places herself in runaway status by leaving the placement without authorization, [she] shall be detained under emergency protective status."

Puck is also a special needs child. Dabney testified that he has an undiagnosed intellectual disability but that no one has identified the disability. Linus stated that a doctor gave Puck a temporary diagnosis of Attention Deficit Hyperactivity Disorder so he could have appropriate services in school. OCS arranged and paid for genetic testing to diagnose Puck's disability. Multiple witnesses testified that Puck acted much younger than his actual age. He went to daycare even though he was 16 at the time of trial and could not be left alone without an adult present.

OCS developed three case plans over the course of the case. The first, from January 2015, identified two goals for Linus — controlling his emotions and learning and demonstrating new parenting skills. The plan referred him to mental health counseling at Life Skills Empowerment Center, a psychiatrist at Fairbanks Community Mental Health Center, and parenting programs at the Resource Center. The second, from May 2015, added completion of a parental risk assessment. The third, from January 2016, added participation in therapy with Carry and her therapist. Linus also met with OCS once and, attended one Team Decision Making Meeting. Linus and his girlfriend walked out of one of these meetings. Beginning in September 2014 Dabney met with Linus several times; she testified that at each meeting he became angry and was "somewhat intimidating" and that almost every time he "did something to make [her] concerned about [her] safety." After Decemeber she refused to meet with him alone and communicated with him mostly by email, mail, or telephone in an emergency.

## C. Linus's Mental Health

Linus testified that years ago when he was in residential alcohol rehabilitation at the Ralph Perdue Center a psychiatrist diagnosed him with bipolar disorder. He acknowledged that he told OCS about the diagnosis early in the case. Romine, Linus's mental health counselor, confirmed that he told her he had been diagnosed with bipolar disorder and she agreed with the diagnosis based on her five

sessions with him. Dr. Cranor explained that she did not give Linus a formal diagnosis because doing so would not be relevant for purposes of her testing but that "he does have some of the traits that you would expect from someone with bipolar disorder." And Elizabeth Pawelko, Linus's expert witness on mental health issues who completed a separate risk assessment, testified that Linus has an "atypical presentation for bipolar disorder" but this was because "[i]t is a rarity for a person to experience bipolar disorder and be able to function at the level [Linus] has without the benefit of medication." She never expressed any doubt about the bipolar diagnosis, and her testimony also assumed that Linus had bipolar disorder when she discussed the challenges Linus would face "white knuckl[ing] his way through managing this condition." Neither Linus nor his attorney ever questioned or denied the bipolar diagnosis at any point in these proceedings.

Expert witnesses testified that bipolar disorder would harm Linus's ability to parent and would be damaging to the children. Expert witnesses also testified that bipolar disorder was best treated with medication, and they recommended Linus see a psychiatrist.

**D.      The Superior Court's Decision To Terminate Linus's Parental Rights**

Trial was conducted over the course of more than two months, with proceedings beginning in mid-February and ending in late April 2016. OCS argued that the children were children in need of aid under AS 47.10.011(1) (abandonment), (4) (failure to provide medical treatment), (6) (substantial physical harm), (8) (mental injury), (9) (neglect), (10) (addiction), and (11) (mental illness). The superior court found by clear and convincing evidence that the children were children in need of aid

under AS 47.10.011(1) (abandonment), (4) (failure to provide medical treatment), (6) (substantial physical harm), (9) (neglect), and (11) (mental illness).[4]

The court also found by clear and convincing evidence that Linus "ha[d] not remedied the conditions or conduct placing the child[ren] at risk, or ha[d] failed to make sufficient progress in a reasonable period of time such that the child[ren] remain[ed] at substantial risk of harm." It found by clear and convincing evidence that OCS made reasonable efforts to help Linus remedy his problematic behavior or conditions. And it found by a preponderance of the evidence that it was in the children's best interests to terminate Linus's parental rights.

In determining that Linus's mental illness placed his children in need of aid the superior court explained:

> Here largely is the heart of the matter. [Linus] agrees and admits he has a long-standing diagnosis of bipolar disorder. Everyone, including his girlfriend, agree[s] he has this disorder. Yet he insists, contrary to all professional advice, that he can handle it by using [Alcoholics Anonymous]. The court finds this decision is without any merit whatsoever based on the record. The evidence establishes that there are treatments available to address this condition and he simply refuses to participate in such treatments. The court finds the evidence establishes that this condition is not capable of being addressed by sheer willpower or grim white-knuckle attitude. The court finds [Linus] knows this, yet chooses to ignore the available advice and remedy by substituting his own ill-informed decision on the subject. This is another example of his black and white thinking where he is focused not on the welfare of his family, but upon his own mistaken interests.

---

[4]     The court found that OCS did not meet its burden of proof under AS 47.10.011(8) (mental injury) and (10) (substance abuse).

In concluding OCS made reasonable efforts the court listed services that OCS provided to the family: Linus was offered mental health assessment/counseling; OCS conducted a Team Decision Making Meeting; Linus was offered parenting classes; OCS made efforts to locate the mother; OCS developed and updated a case plan; and Linus was offered family contacts. The court also acknowledged "[o]ther efforts [that] included referrals for medication management, therapeutic foster care, and a parental risk assessment." Based on this evidence the court found by clear and convincing evidence that OCS made reasonable efforts.

## III.   STANDARD OF REVIEW

"In [Child in Need of Aid (CINA)] cases, we review a trial court's factual findings for clear error and questions of law de novo."[5] Whether a child is in need of aid is a factual question that we review for clear error.[6] "[F]actual findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[7] "Whether factual findings satisfy the requirements of the applicable [CINA] statute is a question of law that we review de novo."[8]

---

[5]     *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (alteration in original) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1264 (Alaska 2014)).

[6]     *Theresa L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 353 P.3d 831, 837 (Alaska 2015) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013)).

[7]     *Joy B.*, 382 P.3d at 1162 (quoting *Chloe W.*, 336 P.3d at 1264).

[8]     *Theresa L.*, 353 P.3d at 837 (citing *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 920 (Alaska 2011)).

" 'Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.'  For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[9]

"Issues not raised in the trial court shall not be considered on appeal, except for plain error."[10]  "[P]lain error exists in a CINA case where 'an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[11]

## IV.  DISCUSSION

### A.  Mental Health

Linus argues the superior court clearly erred in finding that he had a mental illness that placed his children at risk and plainly erred in conditioning his fundamental right to parent on involuntary psychiatric treatment.  All of these arguments concern the superior court's finding that the children were in need of aid due to Linus's mental illness.  But mental illness was only one of five grounds on which the court found the children to be children in need of aid.  Because any of the other CINA findings alone would support the termination order, findings which Linus does not challenge on appeal,

---

[9]     *Joy B.*, 382 P.3d at 1162 (footnote omitted) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014)).

[10]    *D.J. v. P.C.*, 36 P.3d 663, 667-68 (Alaska 2001) (first citing *Sosa v. State*, 4 P.3d 951, 953 (Alaska 2000); then citing *Moreau v. State*, 588 P.2d 275, 279 (Alaska 1978)).

[11]    *Kyle S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 1262, 1267 (Alaska 2013) (alteration in original) (quoting *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118 (Alaska 2010)).

Linus's "challenge to the mental illness finding has no impact on the outcome of the case."[12] We therefore affirm the court's CINA finding.[13]

## B. Reasonable Efforts

"Before terminating parental rights, the trial court must find by clear and convincing evidence that OCS made timely, reasonable efforts to provide family support services to the child[ren] and parents designed to prevent out-of-home placement or

---

[12] *Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007). In his reply brief Linus argues that "the notion of 'refusal to provide medical care' in violation of AS 47.10.011[](4) is a red herring." If this is an attempt to appeal the superior court's finding on this issue, we do not consider the argument because it did not appear in Linus's opening brief. *See In re Ivy*, 350 P.3d 758, 765 n.32 (Alaska 2015). Further, Linus does not address the court's three other grounds for finding the children to be children in need of aid.

[13] Linus does raise an issue that to our knowledge has not been raised before. Throughout the OCS process and at trial Linus told others that he was bipolar. He never said or did anything to call the bipolar diagnosis into question. Linus now argues that OCS did not confirm by expert medical testimony that he was bipolar. Under these circumstances the CINA statutes and regulations did not require OCS to confirm the diagnosis with expert medical testimony.

We also briefly address Linus's constitutional argument. Linus argues that the superior court's order impermissibly conditioned his fundamental right to parent on his taking psychotropic medication. *See Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 246 (Alaska 2006) (holding that the involuntary administration of psychotropic medication implicates a patient's rights to liberty and privacy under the Alaska Constitution); *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979) (recognizing "the right to direct the upbringing of one's child" as "one of the most basic of all civil liberties"). This argument has no merit because the superior court did not do this. The superior court found that Linus's mental health placed the children at risk and found the children to be in need of aid for this and four other reasons. Nowhere in its order did the superior court require Linus to take psychotropic medication as a condition for retaining his parental rights.

enable the safe return of the child[ren] to the family home."[14] These "efforts need not be perfect; they need only be reasonable under the circumstances," which include the parent's "willingness to participate in treatment[,] the history of services provided by OCS[,] and the parent's level of cooperation with OCS's efforts."[15]

Linus contends that the superior court clearly erred in finding that OCS made reasonable efforts. He argues that the court ignored "the obvious personality conflict that developed between Linus and Katie Dabney." He argues that Kristen McKay, the Resource Center employee, testified that the Center had no programs appropriate for Linus because the Center's programs were geared toward early childhood development and not for raising adolescents. Finally, he asserts that OCS included in its safety plan that Linus take psychotropic medication and undergo psychiatric treatments for bipolar disorder even though it never proved he had the disorder.

None of these arguments have merit. First, the record demonstrates that Linus and Dabney did not have a mere personality conflict. Dabney testified that Linus got angry and yelled at almost every meeting and that at almost every meeting she feared for her safety. Linus acknowledged that he got upset and loud with Dabney. Even still Dabney continued to communicate with Linus via email, mail, and occasionally telephone. Second, McKay did not testify that the Resource Center had no programs for

---

[14] *Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1241 (Alaska 2015) (first citing AS 47.10.086(a); then citing AS 47.10.088(a)(3)).

[15] *Id.* (footnotes omitted) (first citing *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013); then citing *Audrey H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 188 P.3d 668, 679 n.35 (Alaska 2008); then citing *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1006 (Alaska 2011); and then citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 953 (Alaska 2013)).

Linus. She explained that at the time the Resource Center had no classes explicitly for parents of adolescents or parents of special needs children, but she also stated that the educators of the general parenting classes and the one-on-one parent coaches had valuable knowledge and insights for Linus and that she was not sure if Linus was willing to engage those resources. She testified that the Resource Center referred Linus to other parenting classes. Finally, Linus stated to multiple people involved in his case that he had bipolar disorder and never questioned or denied this diagnosis either with OCS or in superior court. And OCS did not ask Linus to take psychotropic medication in its case plan; it referred him to a psychiatrist and indicated he should follow the psychiatrist's recommendations.

OCS provided Linus with referrals to therapists, a psychiatrist, a parental risk evaluator, and parenting classes with multiple programs including a program that allowed for increased visitation and one-on-one coaching. It also provided a pre-adoptive foster home to the children with foster parents who could accommodate the children's special needs. And it provided transportation, medical treatment, and therapy for the children, including family therapy for Linus and Carry. OCS developed case plans, held a Team Decision Making Meeting, and maintained contact with Linus throughout the process despite his frequent aggression. Meanwhile, Linus substantially refused to work with OCS, only seeing Romine for five sessions, refusing to see a psychiatrist, and using the Resource Center only for visitation. The superior court did not clearly err in finding that OCS made reasonable efforts.

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Linus's parental rights.